**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**SHELBY COUNTY GOVERNMENT, BOARD of COUNTY COMMISSIONERS, and Clerk of the Shelby County Criminal Court, Defendants.**

**No. 85–2655–GA.**

United States District Court, W.D. Tennessee, W.D.

Sept. 22, 1988.

Dedrick Brittenum, Jr., Asst. Co. Atty., Memphis, Tenn., for defendants Shelby County Government and Bd. of County Com'rs.

J. Minor Tait, Jr., Asst. Co. Atty., Memphis, Tenn., for defendant Clerk of the Shelby County Criminal Court.

Charles A. Shanor, General Counsel, Philip B. Sklover, Associate General Counsel, Equal Employment Opportunity Com'n, Washington, D.C., Joseph Ray Terry, Regional Atty., Harriett Miller Halmon, Supervisory Trial Atty., Robert M. Goff, Sr., Trial Atty., Anthony Brown, Trial Atty., Equal Employment Opportunity Com'n, Memphis, Tenn., for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GIBBONS, District Judge.

Plaintiff Equal Employment Opportunity Commission seeks relief pursuant to 29 U.S.C. § 206(d) on behalf of fourteen female employees of the Shelby County Criminal Court Clerk's Office. The court has considered all the evidence presented and applicable law and makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

The Clerk of the Shelby County Criminal Court is elected by the people of the county for a four-year term. J.A. Blackwell has occupied that position since 1953. The clerk's office, which performs those duties typically associated with court clerks' offices, presently has fifty-four employees, thirty males and twenty-four females, and one vacant position.

On November 3, 1983, Teresa Rae Dowdy, a female employee of the clerk's office, filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that Blackwell paid her less wages than similarly situated males in violation of the Equal Pay Act and Title VII. After investigation the Commission found cause to believe that Title VII had been violated and also issued an equal pay letter of violation finding that males are receiving higher wages than females although the seniority dates are the same and the jobs are equal. Efforts to conciliate the Title VII charges were unsuccessful, and on July 22, 1985, the EEOC filed the instant lawsuit alleging violations of the Equal Pay Act, 29 U.S.C. § 206(d).[1]

The complaint seeks relief on behalf of fourteen female employees of the Shelby County Criminal Court Clerk's Office. These are Julia Bennett, Pam Brigance, Sandra Brown, Sandra Cross, Maerne DeBerry, Belinda Dorse, Teresa Rae Dowdy, Pat Everett, Vera Hoskins, Gloria Low, Bridgett Perry, Teresa Poindexter, Frances Roberts[2] and Phyllis Sheppard. Defendants in the case are Blackwell,[3] Shelby County and the Shelby County Board of Commissioners. The fourteen female claimants seek to compare their salaries to those of nine male clerks. The male clerks are Lane Alley, Jack Applegate, Charles

---

1. No violation of Title VII is alleged in this case because the EEOC is statutorily prohibited from seeking judicial enforcement of Title VII against state and local governments. 42 U.S.C. § 2000e–5(f)(1).

2. Frances Roberts retired in 1985; thus she is not a current employee of the clerk's office.

3. Plaintiff originally named the Shelby County Criminal Court as a defendant. On February 16, 1988, the court entered an order correcting the name of this defendant to reflect the Clerk of the Shelby County Criminal Court as defendant.

Carroll[4], Frank Davis[5], David Vance, J. Pat Vincent, Gerald Voss and Bill Warren[6]. The fourteen female clerk claimants include all female employees with dates of hire in 1973–74, 1975–76, 1978–79 and 1982–83, except for Teresa Whitehead, who was hired in 1983. The nine male clerks include all but two male employees hired in the same years as the female clerk claimants.

1. *Personnel Practices in the Clerk's Office.* During his tenure in office Blackwell has personally made all personnel decisions in the clerk's office; specifically, he has made all decisions about hiring, starting salaries, salary increases, policies and procedures. He has also decided each employee's job duties.

In establishing employee's salaries Blackwell presents a budget to the budget committee of the County Commission. The total amount of money available for salaries is set forth in this budget and approved by the committee. Funds for the salaries are appropriated by the Commission. With regard to salaries for individual employees, at the beginning of each four-year term in office Blackwell prepares a petition setting forth positions in his office and the salary to be paid to each position. This petition is presented to a judge of the Criminal Court, who approves the petition after a hearing. A court order is entered setting the salaries for the particular positions. The salary for a position can be changed only by order of court. If a change is needed during the term, an amended petition is filed. Each petition typically states that the salaries sought are in compliance with the Fair Labor Standards Act, of which the Equal Pay Act is a part. The petitions set salaries for positions; they do not designate the individual who is to occupy any particular position. The decision as to what individual will occupy a position is made solely by Blackwell.

Blackwell personally evaluates all employees. The evaluations are based on his impressions of the employee's performance and any comments about performance received from judges, lawyers or other users of the clerk's office, and Blackwell's chief clerk, Gary Moore. On occasion seniority may be considered, but there is no uniform system basing pay on seniority. According to Blackwell, in evaluating employees he also considers loyalty, honesty, performance, experience, and how the employee reacts in "certain situations".

Because Blackwell is a popularly elected official, his office is not under the jurisdiction of the personnel department of the executive branch of county government. He does not use forms or procedures utilized by that department. Nor is any other written evaluation system utilized; Blackwell bases his evaluations on his own memory. There is no system for communicating the evaluation to employees; Blackwell's evaluation simply results in an employee's placement in a particular slot with a particular salary level. No records of the evaluations are maintained.

All employees of the clerk's office other than the elected clerk are deputy clerks. The petitions, however, reflect various titles for these deputy clerks. The highest-paid deputy clerk is called an administrative assistant II or chief clerk. This position is occupied by Gary Moore, a male, who assumes much of the responsibility for dealing directly with office employees and implementing Blackwell's policies. Below Moore are two individuals called administrative assistants I. Both are male. Each has certain administrative duties within the office. Although their salaries are higher than other employees in the office, these two employees are not paid the same salary. Below the administrative assistant positions are a number of chief principal clerk positions. As of January 1988, thirteen employees had this title. Only two of the thirteen are paid exactly the same salary. Eleven of these individuals are male; two are female. One of the two women in this

---

4. Charles Carroll was terminated from his employment with the clerk's office a few months before trial.

5. Davis retired from the clerk's office in February 1988.

6. Warren retired from the clerk's office in 1986.

category moved into the chief principal clerk category after Dowdy filed her charge. Next in order of salary are the principal clerks. Fourteen people—nine females and five males—occupied this position in January 1988. All are paid less than chief principal clerks, but no two of them are paid exactly the same salary. Below the principal clerks are twenty-five deputy clerks, who are the lowest-paid employees in the clerk's office. In January 1988, eleven men and thirteen women occupied these positions; one position was vacant. Most of these clerks are paid different amounts. Thus, the salary structure for the office contains many different slots, each established by petition. For the vast majority of the slots, the salary for that slot is not the same as the salary for any other slot.

The current pay structure, under which most slots in the office have a salary different from any other slot, is a relatively new one. In July 1983, when the office had fifty employees, there were sixteen different salaries. In February 1985 there were fifty-two employees with seventeen different salaries. During the rest of 1985 the number of employees remained at fifty-two, while the number of different salaries increased to twenty-six in February, forty in July, and forty-three in October. Currently forty-nine different salaries are paid the fifty-four employees.

The female claimants occupy the positions of principal clerk or deputy clerk. The men to whom they seek to compare themselves occupy the positions of chief principal clerk or principal clerk.

Although the petitions refer to various categories of employees, the duties performed by chief principal clerks, principal clerks and deputy clerks are substantially the same. The core duties of each employee occupying these positions include typing, filing, handling legal documents, making entries on books and records and entering data on the computer. The performance of these duties in various sections or departments of the clerk's office results in the processing of a criminal case from initiation to completion. Employees move freely among the various departments, with little or no additional training. Most employees about whom testimony was given at trial had worked in several different departments. In addition to clerks working in the office in various departments, there are clerks assigned to work in the courtrooms. The core duties of the courtroom clerks are the same as those of clerks working in the departments.

Blackwell conceded in his trial testimony that the core duties of clerk's office employees were the same—typing, filing, making entries in books and records and entering data in the computer. He also testified, however, that certain jobs required more skill than others and he identified those jobs as cashier, working with exhibits, and working in the grand jury, appeals, and bond sections.

2. *Comparison of Female Claimants and Male Comparables.* In order to properly compare the female claimants and male comparables, an examination of the work histories of each is necessary.

a. *Work Histories of Female Claimants.* Six of the female clerk claimants began their employment with the clerk's office as transcribers of taped criminal trial proceedings. In the early 1970's the clerk's office had contracted with the State of Tennessee to provide the transcribing service. The county supplemented the salary paid by the state and provided hospitalization and pension benefits for the transcribers. Although the transcribers were sworn deputy clerks, their sole duty was transcription of court proceedings. They were not physically located in the clerk's office. The six claimants initially employed as transcribers and their dates of hire are Pam Brigance (May 1, 1974), Teresa Rae Dowdy (January 1, 1974), Pat Everett (August 1, 1974), Gloria Low (January 2, 1976), Teresa Poindexter (May 1, 1975) and Frances Roberts (May 7, 1973). On July 1, 1976, when Blackwell's office ceased performing the transcribing service, these employees transferred physically to the Criminal Court Clerk's Office. At that time they began to perform the same duties as other employees of the clerk's office.

Since July 1, 1976, Pam Brigance has worked in various areas in the clerk's office, including the courtroom, front office, and the appeals section. She has also assisted in the grand jury section. For a number of years she and Teresa Rae Dowdy worked together as courtroom clerks in Judge Joseph B. Dailey's courtroom. Judge Dailey wrote several letters to Blackwell praising their performance and asking that Blackwell continue to assign them to his division. At the present time Brigance is one of two courtroom coordinators in the office; the other is Pat Vincent. In this position she makes sure that the courts are covered and checks with the courtroom clerks during the day. She also assists them with their work, if necessary. Brigance is currently classified as a principal clerk and her salary is $1,751.00 per month. In response to her inquiry, Moore told Brigance that there were no problems with her work. He also advised her that the only way to get a raise was for someone above her to leave.

Brigance completed one year of college, during which she took primarily secretarial courses. Her employment prior to the clerk's office included Sears, the vocational rehabilitation department at the University of Texas and data processing in the sheriff's department in Shelby County.

Teresa Rae Dowdy is now Judge Joseph B. Dailey's courtroom clerk. Judge Dailey has written letters to Blackwell praising her performance and requesting that her assignment to his courtroom be continued. As a courtroom clerk Dowdy handles duties in each department. In addition, the courtroom clerk is required to be responsible for exhibits in criminal trials, which may include money, drugs and weapons. During her tenure in the clerk's office Dowdy has also worked for a short time in the grand jury section and helped out in the mittimus section. Dowdy is classified as a principal clerk and her monthly salary is $1,702.00.

Moore has told Dowdy that her work is fine. Since she filed the charge, however, Dowdy believes that Moore has watched her work more closely than he did previously. In addition, a number of employees, including Sandra Brown, Pat Everett, and Pam Brigance, who formerly made less than Dowdy, are now paid more. Moore concedes that he advised Dowdy to apologize to Blackwell and to drop the suit. According to Dowdy, Moore also told Dowdy that if "we have to get rid of a couple of people to get rid of one, we will."

Dowdy has a high school education. Prior to working as a transcriber in the criminal court clerk's office, she was a courtroom clerk employed by the city court clerk's office for two years.

Pat Everett currently works in the mittimus section of the clerk's office. She also helps out daily in the front office, provides relief in the courtroom, and updates the bond printout. In the mittimus section she handles three of the eight divisions of criminal court. Her co-workers in that section, Teresa Poindexter and Gerald Voss, handle three and two divisions respectively. Until Poindexter moved to the mittimus section, Everett handled six divisions of court, while Voss handled two divisions. Everett is classified as a principal clerk and her monthly salary is $1,780.00 a month. Everett has a high school education and worked for an insurance company before becoming employed by the clerk's office. Moore has told her that "you have to be in the right place at the right time in order to get a raise."

The record includes very little about the duties performed by Gloria Low in the clerk's office. She is currently a courtroom clerk. She is classified as a principal clerk, and her monthly pay is $1,696.00.

Teresa Poindexter currently works in the mittimus section, where she handles three of the eight divisions of criminal court. She previously has served as backup cashier. She was replaced in this position by Nick Owens because Owens had personality conflicts with others in the office and had to be reassigned. For a time after the birth of twins, Poindexter worked part-time in the clerk's office. She is classified as a principal clerk and her pay is $1,543.00 per month. This is less than the maximum authorized by court order for the slot she occupies, which is $1,588.00 per month.

Frances Roberts worked in the billing and bonding sections and in the front office while she was employed by the clerk's office. She also served as backup cashier. She retired in 1985. At that time her monthly salary was $1,526.00.

The other eight female claimants did not begin their employment with the clerk's office as transcribers. The first of these to be hired was Sandra Brown, hired February 1, 1976. Brown currently works in the bond department. She has previously been a courtroom clerk and has worked in the front office. She is classified as a principal clerk and her current pay is $1,827.00 per month.

Julia Bennett was employed by the clerk's office on September 1, 1976. Bennett currently works in the appeals section. Prior to that she was a courtroom clerk and worked in the mittimus section. She is classified as a principal clerk and her current pay is $1,686.00 per month. Bennett has a bachelor's degree and two years of law school. She previously has taught school, been a nurse's assistant, and managed an attorney's office for sixteen years. She has been told that she was doing a good job.

Bridgett Perry presently works as a courtroom clerk. She has previously worked in the front office and in the grand jury section. Perry was hired October 23, 1979. She is classified as a principal clerk and her monthly salary is $1,508.00. The authorized maximum for her slot is $1,564.00.

Phyllis Sheppard currently works as a courtroom clerk. Most of her experience in the clerk's office has been as a courtroom clerk, although she has some experience in the front office and in the grand jury section. Her date of hire is September 1, 1982. She is classified as a deputy clerk, and her monthly pay is $1,372.00.

Maerne DeBerry works in the bond section at the present time. She is also familiar with the computer codes and is the office troubleshooter on the computer system. Prior to working in the bond section, she worked for a short time in the grand jury section. She has also helped out at the front counter. In the bond department she trained Charles Carroll and she has trained Sandra Cross on the computer. DeBerry was first employed on December 15, 1982. She is now a deputy clerk and her monthly salary is $1,300.00; the maximum amount authorized for her slot is $1,360.00 per month. Moore and Blackwell have both told her that she does a good job. DeBerry has completed three years of college.

Vera Hoskins currently has the responsibility for initially entering the case in the computer when an indictment is returned. It is the same job performed at the present time by Lane Alley. Previously Hoskins worked in the courtroom for a short time and in the front office. She is classified as a deputy clerk and is paid $1,283.00 per month. Her date of hire is January 3, 1983.

Sandra Cross is a courtroom clerk. She has also worked in the grand jury section and in the front office. She was hired July 25, 1983. She is classified as a deputy clerk and makes $1,263.00 per month.

Belinda Dorse is currently working in the front office. She also is a backup to Lane Alley in entering cases on the computer. Although Blackwell indicated that Dorse was hired as a clerk-typist rather than as a deputy clerk, Dorse was sworn in as a deputy shortly after her hire and her first job was entering cases on the computer. Dorse is a deputy clerk, and her current salary is $1,231.00 per month. Her date of hire is September 18, 1978. Prior to working in the clerk's office, she was employed at the health department.

b. *Work Histories of Male Comparables.* Turning to the male employees to whom the female employees seek comparison, the highest paid of these employees is Pat Vincent. Vincent was first employed September 10, 1973. He has worked as a courtroom clerk and in the front office and has worked in the billing, mittimus and appeals sections. Currently he serves as courtroom coordinator with Pam Brigance. Vincent is a chief principal clerk and is paid $2,151.00 a month. He has a high school education.

Charlie Hodges now works at the front counter in the escrow section. He has previously been in the appeals section and worked as a courtroom clerk. Three or four years ago Hodges began to do certain in-house computer programming for the office. Hodges does not, however, do the programming for the overall recordkeeping system of the office. Hodges was first employed January 15, 1974. He is a chief principal clerk and his current salary is $2,064.00 a month. Before being employed by the clerk's office Hodges had worked in sales at Sears. While employed by the clerk's office, he went to school at night and received a bachelor's degree.

David Vance recently began supervising the work of the grand jury section. Prior to that time he had worked in that section of the office. Before beginning employment with the criminal court clerk's office on March 1, 1976, Vance had almost twenty-four years' experience in the city court clerk's office. He had served as the elected city court clerk for almost five and one-half years. Vance's current rate of pay as a chief principal clerk is $2,021.00 per month.

Gerald Voss currently works in the mittimus section, along with Pat Everett and Terry Poindexter. He handles two divisions of court, while each of the female employees in the mittimus section handles three divisions. Prior to working in the mittimus section, Voss worked in the front office. Voss also has responsibility for carrying certain books to the city hall on a two-wheeler.

Voss was first employed in the criminal court clerk's office in 1969. He remained employed there until 1974. During this time Voss worked in the courtroom. Shortly after leaving the clerk's office Voss requested to be rehired. Blackwell agreed to rehire Voss on certain conditions. These included making restitution to someone who claimed Voss owed him money, signing in and out for work each day and riding the bus to work. Voss returned to the criminal court clerk's office on September 3, 1974. His current pay as principal clerk is $1,895.00 per month.

Lane Alley currently enters cases in the computer. Previously he has been in the escrow section in the front office and worked for a short time in the courtroom. Alley is a good cartoonist and can make signs for the office. Alley was first employed May 1, 1974, and currently earns $1,873.00 per month as a principal clerk.

Jack Applegate currently works in the escrow section in the front office. Before becoming employed in the clerk's office on October 26, 1979, he worked at Taystee Bread, was assistant manager of a tire company, and had training in computers. His current pay is $1,600.00 per month, although the maximum authorized salary for his slot is $1,670.00 per month. He is classified as a principal clerk.

Three of the male employees to whom the female claimants seek comparison are no longer employed in the clerk's office. Frank Davis retired in February 1988 due to illness. Prior to his retirement he had worked with warrants. He had prior experience working with the jailbooks and in the grand jury section. After Davis became ill, he was allowed to work part-time with no reduction in pay. After he began part-time work, he did not receive any further raises. Davis was hired August 1, 1982. His salary at the time of his retirement was $1,475.00 per month, although he occupied a slot for which a maximum salary of $1,531.00 was authorized. Before becoming employed at the clerk's office Davis had owned and operated a car dealership and a meat business.

Charles Carroll, the second male employee no longer with the clerk's office, was terminated in 1987. During his employment he worked in the courtroom for a long period of time and also worked in the mittimus and bond sections and in the front office. Charles Carroll's date of hire was May 15, 1974. At the time of his termination his salary was $1,832.00 per month.

Bill Warren was cashier in the clerk's office at the time of his retirement at the end of 1986. He had been cashier since 1981. Prior to that time he had worked in the grand jury section. Warren was classified as a principal clerk at the time of his

retirement, and his salary was $1,767.00 per month. His date of employment was January 1, 1978. Warren's prior experience included fifteen years in the county court clerk's office, where he worked as cashier, and twenty years with the post office.

c. *Performance of Female Claimants and Male Comparables.* All of the female claimants performed their jobs satisfactorily or better. Both Brigance and Dowdy were praised by Judge Dailey for their performance. Moore or Blackwell told a number of the claimants that they were doing a good job. In his testimony Blackwell did make somewhat disparaging remarks about a number of the female claimants. He said that Dorse was "emotional and highstrung" but did a good job; Perry was not always able to produce the needed quantity of work; Poindexter did very good quality work, but was not equal to Applegate; Bennett had personality conflicts.

Although most of the male clerks also have performed their jobs satisfactorily or better, there were significant performance problems with both Charles Carroll and Gerald Voss.

In late 1984 or early 1985 Blackwell began to receive complaints about the performance of Charles Carroll. Carroll was a courtroom clerk at that time and Judge William H. Williams asked that Carroll be removed from the courtroom because he was sleeping in the courtroom or the jury room. Carroll told Blackwell that his doctor had told him that he had a sleeping disorder that caused this behavior. Carroll was given another job outside the courtroom. Problems continued with Carroll's not being on the job when he was supposed to be there. Blackwell described his performance as "minimal" and said that they "had to watch" him. Eventually Carroll was arrested and Blackwell learned at that time that his job problems were attributable to drug usage. Carroll entered a county employee assistance program, which included hospitalization. Upon returning to the job, Carroll could not perform successfully. He was eventually terminated in 1987. Between the time complaints began

about Carroll's performance and his termination, he received five or six salary increases.

Voss's performance problems are apparently of longer duration. He was permitted to return to employment in the clerk's office in 1974 only upon certain conditions. Voss has a drinking problem. Several employees testified that they had seen him intoxicated at work. Several employees testified that this information as well as complaints from outsiders about Voss had been relayed to Moore on numerous occasions. Blackwell denied ever seeing Voss intoxicated at work, but acknowledged that he had told Voss his breath smelled like a brewery from his activities the night before. Blackwell is aware of the drinking problem and has talked to Voss about it on at least two occasions. Blackwell also acknowledged that he once had received a complaint from a user of the clerk's office about the condition of an individual who had waited on him at the counter.

Although Blackwell described Voss as a "go-go-go" person who attempted to serve, several other employees testified about problems with Voss's performance. Dowdy and Everett both testified that Voss makes many errors and is emotional and tearful when he is drinking. Moore told Everett to take care of Voss when he was assigned to the mittimus section. When other employees in the mittimus section are absent, Everett handles all the work of that section. Voss, however, receives help when either Everett or Poindexter is absent.

Although the other males to whom the female claimants seek to compare themselves performed satisfactorily or better, several had problems of the same type that Blackwell noted about the female claimants. For example, Blackwell observed that Alley "takes good directions, but doesn't get along as well with others." Alley had a personality conflict in the courtroom, and Judge Terry Lafferty asked that he be removed from the courtroom after a short time. Hodges and a clerk named Ken Goodrich failed to enter approximately three hundred cases on the

reference docket. This created a backlog in the work of the courtroom division to which Hodges and Goodrich had been assigned. The three hundred cases were later entered on the reference docket by Dowdy and Everett.

d. *Salary Comparisons of Female Claimants and Male Comparables.* Virtually all employees of the clerk's office receive fairly frequent raises. Listing each amount paid to each employee at a particular point in time in the text of this opinion would be cumbersome. Yet findings concerning past raises will assist in the disposition of the case. Therefore, the court incorporates by reference in this opinion collective Exhibit 3, which lists each salary received by each of the female claimants and the nine male comparables from date of hire to the present: collective Exhibit 24, which includes the same information for each employee of the clerk's office from 1976 to the present; and Exhibit 27, which contains substantially the same information as Exhibit 24 in somewhat different form.

Using the information contained in these exhibits, the female claimants and male comparables can appropriately be compared by dates of hire. Plaintiff suggests four groups, consisting of (1) 1973 and 1974 hirees; (2) 1975 and 1976 hirees; (3) 1978 and 1979 hirees and (4) 1982 and 1983 hirees, which the court finds are the most appropriate groupings for comparison purposes. In each of these four groups the highest paid female clerk is currently paid less than the lowest paid male clerk. These groups and the salaries of each employee in the groups are as follows:

### Group A—1973 & 1974 Hirees

| Females | | Males | |
|---|---|---|---|
| F. Roberts (5–7–73) | $ 725/1976<br>$1526/1985 | J. Pat Vincent (9–10–73) | $ 954/1976<br>$2151/1988 |
| T. Dowdy (1–1–74) | $ 844/976<br>$1702/1988 | C. Hodges (1–15–74) | $ 954/1976<br>$2064/1988 |
| P. Brigance (5–1–74) | $ 700/1976<br>$1751/1988 | L. Alley (5–1–74) | $ 816/1976<br>$1873/1988 |
| P. Everett (8–1–74) | $ 600/1976<br>$1780/1988 | C. Carroll (5–15–74) | $ 816/1976<br>$1832/1987 |
| | | G. Voss (9–3–74) | $ 500/1976<br>$1895/1988 |

### Group B—1975 & 1976 Hirees

| | | | |
|---|---|---|---|
| T. Poindexter (5–1–75) | $ 525/1976<br>$1543/1988 | D. Vance (3–1–76) | $ 700/1976<br>$2021/1988 |
| G. Low (1–2–76) | $ 500/1976<br>$1696/1988 | | |
| S. Brown (2–1–76) | $ 550/1976<br>$1827/1988 | | |
| J. Bennett (9–1–76) | $ 576/1976<br>$1686/1988 | | |

### Group C—1978 & 1979 Hirees

| | | | |
|---|---|---|---|
| B. Dorse (9–18–78) | $ 458/1978<br>$1231/1988 | B. Warren (1–1–78) | $ 886/1978<br>$1767/1986 |
| B. Perry (10–23–79) | $ 600/1979<br>$1508/1988 | J. Applegate (10–26–79) | $ 600/1979<br>$1600/1988 |

### Group D—1982 & 1983 Hirees

| | | | |
|---|---|---|---|
| P. Sheppard (9–1–82) | $ 800/1982<br>$1372/1988 | F. Davis (8–1–82) | $ 850/1982<br>$1475/1988 |
| M. DeBerry (12–15–82) | $ 850/1982<br>$1300/1988 | | |
| V. Hoskins (1–3–83) | $ 850/1983<br>$1283/1988 | | |

Females                     Males
S. Cross (7–25–83)     $ 800/1983
                  $1263/1988

In addition to the groupings of employees, individual comparisons of employees are also useful. Several examples are of particular importance in evaluating this case. Teresa Rae Dowdy began performing the duties of a deputy clerk in 1976, when she was moved from the transcriber position. In 1976 her rate of pay was $844.00 per month. Gerald Voss had that same salary at the end of 1976, a year in which he received five raises and rose from a salary of $500.00 per month to a salary of $844.00 per month. In 1977 both Dowdy and Voss received two raises. Both of Voss's raises were slightly larger than Dowdy's raises and at the end of the year Dowdy was making $904.00 per month and Voss was making $940.00 per month. Although Voss and Dowdy have both received relatively frequent increases since that time, the discrepancy in salary has continued to grow. Dowdy is now paid $1,702.00 per month and Voss is paid $1,895.00 per month.

A similar comparison can be made between Dowdy and David Vance. Both Dowdy and Vance made $844.00 at the end of 1976. At the end of 1977 Dowdy was paid slightly more than Vance, but in 1978 Vance's salary increased over Dowdy's. The discrepancy of $52.00 per month in salary at the end of 1978 has grown, and Dowdy is now paid $1,702.00 per month, while Vance is paid $2,021.00 per month. Dowdy's salary can also be compared with that of Bill Warren. Their salaries were the same at the end of 1978, the year in which Warren was hired. By the end of 1980 Warren's salary exceeded Dowdy's. At the time of his retirement in 1986 Warren made $1,767.00 per month, while Dowdy made $1,586.00.

Another useful comparison is that between the salaries of Bridgett Perry and Jack Applegate and Bridgett Perry and Frank Davis. Perry and Applegate were hired within three days of each other in 1979. Their starting salary was the same. By the end of 1980, a year in which Applegate received five raises and Perry received four raises, Perry was being paid $39.00 less than Applegate. The pay difference has continued and increased slightly to the present. Perry is now paid $1,508.00 per month; Applegate is paid $1,600.00 per month.

Perry was hired almost three years before Frank Davis. At the time Davis was hired, Perry made a higher salary than he did. In 1983, the year after Davis's employment, the two had the same salary. In 1984, however, Davis began to receive a higher salary than Perry. By the end of 1986 Davis was making $1,422.00 per month, while Perry was making $1,344.00 per month. In 1987 and 1988 Davis worked part-time because of his illness and did not receive further raises. During this period of time Perry's salary again passed that of Davis.

Davis and Maerne DeBerry can also be compared. Both were hired in 1982 at the same salary. Yet Davis is now paid $1,475.00 per month, despite his absence from work due to illness, while DeBerry earns $1,300.00.

*3. Other Evidence Relating to Reasons for Wage Disparity.* In addition to proof concerning salaries and job duties, the parties presented other evidence relevant to a determination of the reasons for the wage disparities in the clerk's office. Plaintiff claims that its proof supports a finding of discriminatory intent on the part of Blackwell and such intent lends credence to its position that no factor other than sex accounts for the wage disparities.

Several witnesses testified concerning preferential treatment allegedly received by male employees. The first category of treatment relates to the activities of certain male employees in refereeing sports events. Male employees who refereed sports events were allowed to leave work early to perform these extracurricular activities. Blackwell concedes that several male employees did leave work early on a regular basis to referee sports events.

There is no indication that any women referees were denied an opportunity to leave early.

Proof was also presented that several male employees who were going to school at night were permitted to study at work. No evidence was presented that any female employee was prohibited from studying at work or that the situation was any different with respect to male and female students.

There was testimony that men received raises when they married or had a child. The source of this information was the male employees, however, and the only other evidence on this issue was Blackwell's denial that it occurred. The hearsay statements of unidentified male employees, although admitted without objection, cannot provide a basis for a finding that male employees received raises on such occasions.

Male employees were permitted to attend the annual bar association picnic and to play in an annual golf tournament. Although female employees did not attend either of these events, there was no formal effort by Blackwell to exclude the women from them. Social custom simply dictated that women were not asked to participate in these events.

Blackwell infrequently socializes with male employees of his office, but occasionally does have lunch with a few of them. He does not socialize with any female employees in his office at all and does not go to lunch with them. Blackwell explained this by saying he had a wonderful wife, four children and six grandchildren and that, while he put the female employees of his office on the "highest pedestal," he did not want to "set anything but an example of my family life...."

Another allegation is that Pat Everett was required to iron certain large books to straighten their pages, while male employees were not required to do this. The weight of the evidence is, however, that at least one male employee also performed this duty.

Plaintiff also alleges that men were permitted to keep personal items on their bulletin boards, while women were required to remove such items. Clearly, there was a problem with tasteless and, on occasion, sexist personal items on bulletin boards and employees were asked to remove such items. At least one male employee refused. Thus, for a time, a male employee was permitted to leave an inappropriate item on display. Ultimately all offensive items were removed. The difference in treatment of male and female employees in this instance arose from Moore's inability to procure immediate universal compliance with his request that all items be removed.

Finally, plaintiff alleges that male and female employees were treated differently with respect to the assignment of parking places. While all employees have a place to park, there is one particularly convenient lot close to the building. Moore told Dowdy that the assignment of places in that lot was based on seniority. He told Everett that it was based on seniority "to a certain extent." After both Dowdy and Everett inquired about parking places, they received parking places in the desirable lot. If the date of original employment as transcriber is used for Dowdy, men with less seniority did receive convenient parking places before she did. Everett indicated that she did get her parking place at the appropriate time, after checking on it at an earlier time.

Plaintiff also relies on certain statements by Blackwell to support a finding of discriminatory intent on the part of Blackwell in setting salaries. One of these statements is Blackwell's use of the term "Bubba's boys." Bubba is Blackwell's nickname, and he has frequently used the term "Bubba's boys" to refer to male employees in his office. Blackwell has also used the term "Bubba's girls" to refer to female employees, but the use of this term did not begin until after the filing of this lawsuit and has been less frequent than the use of the term "Bubba's boys." Blackwell used both terms in a meeting with employees in which he discussed this lawsuit at least implicitly. At that time, in explaining why raises were given to "Bubba's boys" and

"Bubba's girls," he said that there were favorites in all aspects of life.

Another incident relied on by plaintiff concerns Dowdy's hiring in the clerk's office in 1974. She had previously been employed as a courtroom clerk in the city court clerk's office and was interested in a similar job in the criminal court clerk's office. Blackwell told her that his office had no women in the courtroom and hired her as a transcriber instead. Blackwell concedes that there were no women in the courtroom as clerks at that time, but insists that he was merely complying with the wishes of a judge in adopting that policy. Two weeks after Dowdy began work as a transcriber, Charlie Hodges, who had no prior experience in a clerk's office, began work in the clerk's office.

Plaintiff also refers to certain testimony given by Blackwell at trial concerning the bases for his evaluation of employees. He described Pat Vincent as an all-Memphis athlete who "had the athletic ability or physical ability to do certain jobs." In describing Terry Poindexter, he said "she is one of the people, young people with the area of being just a real nice person, and so forth. She has a family situation that is fantastic, twins, and so forth, to go along with, but she has grown up from Terry Foley to Mrs. Poindexter today, and during that period of time and the transition she has made a graceful transition and is able to take on further responsibilities." Plaintiff argues that inappropriate consideration of Vincent's athletic ability and Poindexter's family situation indicates Blackwell's sexual bias.

Defendants presented evidence in support of their contention that there was no intent to discriminate. Blackwell denied that sex had ever been a factor in giving a raise to any employee. Blackwell attributed any discrepancy in salaries to his subjective evaluation of employee performance, the employee's prior experience, the slot system utilized to determine pay and seniority. With respect to the six female claimants who were transcribers, Black-

well's position is that he has always considered their date of employment to be July 1, 1976, the day they stopped transcribing, rather than the date on which they were first employed by the clerk's office. This, he insists, accounts for many of the pay discrepancies about which plaintiff complains. Blackwell also has considered work experience prior to employment in determining salaries in the clerk's office. He testified about the valuable prior experience of Davis, Vance, Warren, Applegate and Hodges. In giving Voss raises, Blackwell has considered his 1969–74 employment period as well as the period from 1974–present.

Blackwell also points out that female as well as male employees have received special consideration in his office. Julia Bennett was allowed to take a leave of absence to do church work and four female employees who had exhausted their sick leave were not required to be absent without pay or borrow from future leave. An unmarried pregnant transcriber was allowed to work at home until after the baby arrived.

Defendants further rely on the balance between male and female employees—thirty male and twenty-four female—as evidence of lack of discriminatory intent. Blackwell puts particular emphasis on the fact that the highest-paid deputy clerk in his office for many years was a woman, Jewell Mottweiler[7], as was the next highest-paid employee, Emily Tharpe. These women were both in the clerk's office when Blackwell was first employed there, at a time when the clerk's office only had three employees. Mottweiler's date of hire was May 5, 1948, and Tharpe was hired December 1, 1951. Mottweiler retired on January 1, 1983; her salary at that time was $2,186.00 per month. She was replaced by Gary Moore, who was first employed in 1964 and who assumed the position at a salary of $2,296.00. Tharpe retired in 1976.

Defendants rely on two other pieces of evidence. First, during his years as clerk, Blackwell has hired only five individuals

---

**7.** Blackwell testified that, while Mottweiler was in this position, he asked each new employee whether the employee would mind working under a female chief clerk.

from outside the clerk's office at salaries higher than those of existing employees. Three of these are male; two are female. Bill Warren and David Vance, both male comparables, are in this group. No claimant is a part of it.

Second, Blackwell relies on evidence of instances in which employees received salary increases over an employee with greater seniority. Employees in the criminal court clerk's office have frequently received raises that resulted in a salary for that employee higher than that of an employee with greater seniority. The record indicates that on thirty-four occasions since 1976 a male employee has received such an increase that resulted in his being paid more than a female employee with greater seniority. On only eight occasions a female employee has received such an increase that resulted in her being paid a salary higher than a male employee with greater seniority. On twenty-five occasions a female employee has received such an increase resulting in her being paid more than a female employee with greater seniority, and on twenty-nine occasions a male employee has received such an increase that resulted in his being paid more than a male employee with greater seniority.

## II. CONCLUSIONS OF LAW AND ANALYSIS OF THE EVIDENCE

As the parties concede, this court has jurisdiction of this action to enforce the Equal Pay Act, 29 U.S.C. § 206(d). Plaintiff is authorized to bring this action pursuant to 29 U.S.C. §§ 216(c) and 217. Defendants are subject to the requirements of the Equal Pay Act, 29 U.S.C. § 206(d).

■ To establish a claim of unequal pay for equal work under the Equal Pay Act, plaintiff has the burden of proving that the employer pays different wages to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Odomes v.*

*Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). The use of the phrase "equal work" does not require that jobs be identical, but only that there be a "substantial" equality of skill, effort, responsibility and working condition. *Odomes v. Nucare, Inc.*, 653 F.2d at 250; *see Brennan v. Owensboro–Daviess County Hospital*, 523 F.2d 1013 (6th Cir.1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976). Whether the work is substantially equal must be assessed on a case-by-case basis by making an overall comparison of the work, not its individual segments. *Id.* Even if the work is substantially equal, there is no violation if defendant proves that the wage disparity is based upon a seniority system, merit system, quality or quantity of work, or a factor other than sex. 29 U.S.C. Section 206(d)(1); *Corning Glass Works*, 417 U.S. at 195–96, 94 S.Ct. at 2228–29.

■ Plaintiff has established by a preponderance of the evidence that all employees categorized as chief principal clerk, principal clerk and deputy clerk performed substantially equal work. Although the employees in these categories have one of three different titles, the actual job performance and requirements for all three categories are the same. *See EEOC v. Central Kansas Medical Center*, 705 F.2d 1270, 1273 (10th Cir.1983); *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 288 (4th Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). The core job duties for all employees in all of these positions are the same. These duties include typing, filing, handling legal documents, making entries in books and records and entering data in the computer. Employees move frequently from one position to another with little or no additional training. The jobs involve substantial equality of skill, effort, responsibility and working condition.

Blackwell contends that certain positions in the clerk's office require greater skill than others. The positions listed as requiring greater skill include cashier, exhibits custodian and working in the grand jury, appeals and bond sections. Despite Black-

well's assertions, the record is devoid of any evidence concerning job duties from which a finding can be made that work in the grand jury, appeals and bond sections requires any greater skill than working in any other position in the clerk's office. With respect to the cashier's position, there is evidence that the duties of that job are slightly different from those of other positions. Certainly, common sense dictates that a reliable person must occupy the cashier's position. When an overall comparison of the work in the cashier's position and that of other positions is made, however, the differences in skill, effort, and responsibility among the positions are minor. *See Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 449 (D.C.Cir.1976).[8] The fact that two female claimants—Terry Poindexter and Frances Roberts—served as backup cashier buttresses this conclusion. Similarly, any differences in skill, effort and responsibility required to perform the exhibit custodian's job and other positions in the office are minor. In fact, the courtroom clerks are regularly required to assume custody of exhibits, including drugs, money and weapons, the same types of items entrusted to the exhibit custodian. Quite simply, the proper performance of all the jobs at issue requires the exercise of substantial skill and responsibility. Although the cashier and exhibit custodian have responsible jobs, there is little difference between the degree of responsibility required for their jobs and other positions in the office.

Plaintiff has also established by a preponderance of the evidence that there are pay differences between male and female employees in the office. The fact that most employees are not paid exactly the same as any other employee makes comparisons based on sex more difficult. Clearly, however, plaintiff has established that various male comparables earn more than each female claimant to whom they are appropriately compared. In addition,

plaintiff's groupings of female claimants and male comparables by date of hire and the resulting finding that the lowest-paid male in each group earns more than the highest-paid female is convincing evidence of unequal pay.

Because plaintiff has established that the female claimants received lower wages than the male comparables for equal work, it has carried its burden of proof with respect to each of the fourteen female claimants.

When a plaintiff has established that a claimant has been paid unequally for equal work, the burden shifts to the employer to show that the differentiation is justified based on one of the four exceptions found in 29 U.S.C. § 206(d)(1). *Corning Glass Works*, 417 U.S. at 196–97, 94 S.Ct. at 2229. Defendant must prove by a preponderance of the evidence that the wage disparity is based upon a seniority system, merit system, quality or quantity of work, or a factor other than sex. *Id.* Defendants apparently rely on at least three of these four exceptions in their effort to justify the various wage distinctions. The court finds that the defendants have not carried their burden with respect to any of these defenses.

■ With respect to seniority, the evidence is clear that seniority is a factor considered on occasion in determining raises. Clearly, however, by Blackwell's own admission, there is no uniform system basing pay on seniority. In fact, defendants introduced evidence of instances in which employees received raises over employees with greater seniority. The records of raises and dates of employment strongly support the conclusion that there is no seniority system. In order to provide a defense under the Equal Pay Act to wage differences, there must be a *bona fide* seniority system that is uniformly applied. *See EEOC v. Whitin Machine Works, Inc.*, 635 F.2d 1095, 1097–98 (4th Cir.1980); *Hodgson*

---

**8.** The court in *Laffey* noted that "a wage differential is justified only if it compensates for an appreciable variation in skill, effort or responsibility between otherwise comparable job work activities." 567 F.2d at 449. The court went on

to state that "if in the aggregate the jobs require substantially similar skills, efforts and responsibilities, the work will be adjudged equal despite minor variations." *Id.*

*v. Washington Hospital,* 9 BNA FEP Cas 612 (W.D.Penn.1971) [1971 WL 128]. Although no *formal* seniority system is required, *see EEOC v. Whitin Machine Works, Inc.,* 635 F.2d at 1097–98, the statutory use of the word "system" cannot be disregarded. In order for a seniority system to exist, seniority must be regularly, rather than sporadically, considered.

■ Nor have defendants established that the wage differences are based on a merit system. Although Blackwell contends that merit was considered, merit was simply one of many subjective factors that Blackwell took into account in determining raises. There was no organized system for measuring performance. Employees were not evaluated regularly and were given no regular appraisals of their performance. Courts considering this defense have generally required a structured evaluation procedure with objective standards, and have deemed a system based on subjective criteria insufficient. *See Maxwell v. City of Tucson,* 803 F.2d 444, 447 (9th Cir.1986); *EEOC v. Aetna Insurance Co.,* 616 F.2d 719, 725 (4th Cir.1980); *Brennan v. Victoria Bank and Trust Co.,* 493 F.2d 896, 901 (5th Cir.1974); *Grove v. Frostburg National Bank,* 549 F.Supp. 922, 934 (D.Md.1982). Defendants have shown no more than at times Blackwell's subjective consideration of merit may impact the salary awarded. Thus, defendants have failed to prove the existence of a merit system on which pay differentials are based.

■ Defendants did not prove that pay differentials were based on any system measuring quality or quantity of work. This particular exception refers to an incentive plan that measures production. Except for a fleeting reference by Blackwell to his consideration of quality and quantity of work in determining raises, there was no

evidence supporting the existence of such a system.

■ Finally, defendants have failed to establish that a factor other than sex is the basis for the wage difference. The record does establish that Blackwell has considered factors other than sex in determining salary. Certainly, seniority, performance and job-related personal characteristics have been taken into account to some extent and in some instances in determining raises. Defendants have failed to carry their burden, however, because the record also establishes that sex is one of the factors to which the differences in pay are attributable and is a "but for" cause of the disparity. *See Peters v. City of Shreveport,* 818 F.2d 1148, 1161 (5th Cir. 1987) [9].

The employees' salaries themselves are the strongest evidence that sex played a part in determining salaries. Of the four groups of male and female comparables hired at approximately the same times, the lowest-paid male in each group was paid more than the highest-paid female. Only two of the sixteen highest-paid employees in the office are women.

Blackwell's efforts to attribute wage differences solely to factors other than sex are unconvincing. Blackwell seeks to explain differences in pay for former transcribers by saying that he considered their date of employment to be July 1, 1976, when they ceased transcribing duties. Thus, he seeks to explain their pay differences by lack of seniority. Seniority may in fact partly account for some of the pay differences. Yet seniority was a factor not always considered in determining raises, and clearly does not account for all the disparities. For example, Teresa Rae Dowdy's pay in 1976 was the same as that of Gerald Voss, an employee whom Blackwell

**9.** The Fifth Circuit Court of Appeals in *Peters* discusses in detail the proper causation standard in mixed-motive cases under the Equal Pay Act and concludes that a "but for" or "cause-in-fact" standard is appropriate rather than an inquiry as to whether sex played any part whatsoever in the employer's decision. 818 F.2d at 1155–61. This court agrees with the *Peters* court. The *Peters* standard permits the employ-

er to establish the "any factor other than sex" defense even when sex played some part in its decision, if it can show that the same pay disparity would have existed even absent its consideration of sex. *Id.* at 1161. *Peters* is apparently the only reported case explicitly discussing the appropriate causation standard for mixed-motive cases under the Equal Pay Act.

viewed as having more seniority than Dowdy. Differences in the pay of these employees that arose later could hardly be due to Dowdy's lack of seniority.

Performance, the other factor that Blackwell suggests justifies the wage differences, also cannot account for the pay differences between the comparable groups. All the employees in the groups performed well, with the exception of Carroll and Voss. Carroll's performance ultimately resulted in his termination. Although Voss is still employed, the overwhelming evidence is that his job performance is poor. Yet Carroll and Voss have received higher salaries than the female claimants to whom they are compared. Performance clearly cannot be a basis for justifying the wage differences revealed by the evidence.

Similarly, education and prior experience cannot provide a justification for the salary differences. While some male employees, notably Warren and Vance, had valuable prior experience, the prior experience, if considered, would provide a basis for a starting salary higher than that of less-experienced current employees. Yet Warren's starting salary was the same as the salary paid Julia Bennett and Pat Everett at the time, and less than the salary paid Pam Brigance and Teresa Rae Dowdy at that time. Vance's starting salary was the same as the salary paid Pam Brigance at that time and less than the salary paid to Frances Roberts at that time. Prior experience could hardly be a reason for the later salary increases received by Warren, who at the time of his retirement was paid more than any of the claimants, and Vance, who currently earns more than any claimant. Blackwell's explanation that prior experience accounts for the present salaries of Warren and Vance is simply not credible.

Further, Blackwell was inconsistent in his reliance on education and experience. Julia Bennett has more years of education than any other employee whose education was included in the record; yet her educational level did not result in a salary higher than employees without as much education. On the other hand, Blackwell justified Charlie Hodges' salary in part by the fact that Hodges had earned a bachelors' degree. Similarly, Blackwell explained Hodges' and Applegates' salaries as partly attributable to prior job experience unrelated to their clerk's office jobs, yet apparently gave Dowdy no credit for prior related experience in the city court clerk's office. These inconsistencies lend support to plaintiff's position that sex determined salary differences in the office.

Nor can the requirement that salaries be set by petition provide a justification for salary differences. Blackwell alone determines the content of the petition and he alone determines what employee occupies each slot.

Other proof in the record strongly supports the conclusion that sex was a factor that determined salaries in the clerk's office. Although defendants rely on evidence concerning occasions on which employees received raises over an employee with greater seniority, this evidence actually supports plaintiffs' position. On *thirty-four* occasions since 1976 a male employee has received an increase that resulted in his being paid more than a female employee with greater seniority. Yet on only *eight* occasions has a female employee received an increase that resulted in her being paid a salary higher than a male employee with greater seniority.

Several of plaintiffs' claims of preferential treatment for men are not supported by the record. These include the allegations concerning studying at work, ironing books and bulletin boards. Other incidents of proven preferential treatment occurred due to the thoughtless preservation of outdated custom, rather than to a conscious consideration of sex in determining conditions of employment. In this category are the allegations concerning participation by male employees in the bar picnic and the golf tournament. The allegation about refereeing sports events is similar. Because women have not traditionally refereed sports events, men who left early did receive a benefit that female employees did not have. Yet it can hardly be said that any female employee was denied an oppor-

tunity to leave early to referee a sports event. The evidence concerning parking places is too inconclusive to permit an inference concerning intent to discriminate—Everett got her parking place while Dowdy was delayed in obtaining her place.[10]

Other evidence concerning treatment of women does support plaintiff's position. At one time women were not allowed to work in the courtroom. Although Jewel Mottweiler, a valued employee, was the highest-paid deputy clerk and as chief clerk supervised employees, Blackwell considered it appropriate to ask new employees if they objected to working for a female chief clerk. He considered Terry Poindexter's family situation relevant to an evaluation of her performance. Accompanying male employees to lunch, but not female employees, reflects some difficulty on Blackwell's part in viewing female employees simply as professional co-workers. The use of the term "Bubba's boys" and the relationship Blackwell has with his male employees is suggestive of a father-son relationship in many instances. Although the record indicates that Blackwell takes a personal interest in all his employees, women employees are precluded from the type of relationship that sharing lunch and golf games, even occasionally, can encourage.

The evidence taken together—statistics of salaries and raise histories, the background and performance of employees, Blackwell's own testimony about the reasons for his actions and, to a lesser extent, proof about differing treatment of male and female employees—strongly supports a conclusion that the existing pay disparities would not have occurred in the absence of consideration of sex. Certainly, defendants have not carried their burden of proving otherwise.

Defendants' case is of necessity almost entirely dependent on Blackwell's credibility as a witness. While Blackwell's sincere concern for each of his employees was apparent in his testimony, his inconsistent and at times illogical explanations of the reasons for the salaries in his office simply cannot provide a basis for finding that defendants have carried their burden of establishing that the salaries are based on a factor other than sex. Under Blackwell's subjective and unsystematic method for evaluating employees, sex easily became a factor in determining raises.

The court finds that defendants have violated the Equal Pay Act. 29 U.S.C. § 206(d). Claimants are therefore entitled to backpay. 29 U.S.C. § 216(b). Pursuant to 29 U.S.C. § 255(a) a claimant may recover back wages for three years prior to filing suit if the violation is willful. If the violation is not willful, recovery is limited to a period of two years prior to filing suit.

■ The court finds that defendants' violation of the Equal Pay Act was willful. Defendants were unquestionably aware of the requirements of the Equal Pay Act. Each petition filed by Blackwell indicated that the salaries paid were in compliance with the Fair Labor Standards Act. Yet no effort was made to ensure that the salaries paid in the clerk's office did in fact comply with the Equal Pay Act. Even if defendants were unaware of the illegality of their actions, they displayed complete and reckless disregard of the requirements of the Equal Pay Act. Under these circumstances the violation is a willful one. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126–127, 105 S.Ct. 613, 624–625, 83 L.Ed.2d 523 (1985) (defining willfulness under the ADEA as "reckless disregard"). Therefore, claimants are entitled to recover backpay from July 1982, three years before suit was filed, to the present.

Because of the many differing salaries in the clerk's office, computation of backpay is complex. Plaintiff contends that the appropriate method for determining backpay is to award each claimant the difference between her earnings from July 1982 to the

---

10. The denial of a parking place to Dowdy, along with other evidence in the case, could support a finding of retaliation against Dowdy. Retaliation is not an issue in this case, however, and therefore no finding of retaliation will be made. The possibility of retaliation as a motive for the denial of a parking place, however, makes the denial questionable evidence of discrimination.

present and the average earnings of the male group with comparable dates of hire during that time period. The court agrees that this method is the most accurate and appropriate one for computing the backpay for all claimants. Frances Roberts, who retired in 1985, will receive backpay only to her date of retirement. Using this method, the court awards backpay to each of the fourteen female claimants in the following amounts:

| | |
|---|---|
| Julia Bennett | $18,837.00 |
| Pam Brigance | $14,802.00 |
| Sandra Brown | $11,442.00 |
| Sandra Cross | $14,310.00 |
| Maerne DeBerry | $10,964.00 |
| Belinda Dorse | $25,994.00 |
| Teresa Rae Dowdy | $15,213.00 |
| Pat Everett | $13,833.00 |
| Vera Hoskins | $11,412.00 |
| Gloria Low | $19,671.00 |
| Bridgett Perry | $20,543.00 |
| Teresa Poindexter | $32,406.00 |
| Frances Roberts | $ 3,580.00 |
| Phyllis Sheppard | $ 9,745.00 |

■ Plaintiff also seeks liquidated damages on behalf of each claimant. Under the Equal Pay Act a claimant may recover an amount equal to backpay as liquidated damages unless defendant can demonstrate that a good-faith effort was made to comply with the law. 29 U.S.C. § 216(b); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). Specifically, defendant must show that his action was "in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the statute. 29 U.S.C. § 260. The showing required of a defendant is a difficult one. As the court in *Laffey* explained, courts have discretion to deny liquidated damages,

> if the employer [can] meet the 'substantial burden' of proving that his failure to comply was in good faith and also was predicated on reasonable grounds for a belief that he was in compliance. If the employer cannot convince the court in these respects, an award of liquidated damages remains mandatory.

*Id.* at 464–65.

■ Defendants have not met that burden. Defendants were aware of their obligation to comply with the Fair Labor Standards Act. Even if Blackwell subjectively believed that he was not violating any law, the standard imposed on a defendant is an objectively reasonable one. Judging defendants' conduct by such a standard, the statutory burden has not been met.

■ Although plaintiff also seeks prejudgment interest on behalf of each claimant, the court will not award prejudgment interest. Neither the United States Supreme Court nor the Sixth Circuit Court of Appeals has addressed the propriety of an award of prejudgment interest under the Equal Pay Act. When liquidated damages are awarded, however, an award of prejudgment interest is not necessary to afford complete relief. *Cf. Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) (holding that a liquidated damages award replaces an award of prejudgment interest under the Fair Labor Standards Act).

Claimants are also entitled to new monthly salaries that cure the statutory violation. In computing these salaries, the amount of each new salary is appropriately determined by the average monthly salary presently paid to males within each group of comparisons. Using these figures, the court orders that defendants grant to each claimant a prospective wage increase. The monthly salary for Julia Bennett, Pam Brigance, Sandra Brown, Teresa Rae Dowdy, Pat Everett, Gloria Low and Teresa Poindexter shall be $1,963.00. The monthly salary for Belinda Dorse and Bridgett Perry will be $1,683.00. The monthly salary for Sandra Cross, Maerne DeBerry, Vera Hoskins and Phyllis Sheppard will be $1,475.00.

In addition, all defendants and their agents and successors are enjoined from further violations of the Equal Pay Act.

Judgment shall be entered for plaintiff in accord with this order.

IT IS SO ORDERED.