**F I L E D**

**PUBLISH**

**August 28, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JENNIFER J. MICKELSON,

        Plaintiff - Appellant,

    v.

NEW YORK LIFE INSURANCE
COMPANY,

        Defendant - Appellee.

_____

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Amicus Curiae.

No. 05-3049

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D. Ct. No. 03-CV-2294-CM)**

---

Mark A. Buchanan, Sanders, Simpson & Fletcher, L. C., Kansas City, Missouri, appearing for the Appellant.

Elaine Drodge Koch (Jeremiah J. Morgan and Heather S. Esau Zerger, with her on the brief), Bryan Cave LLP, Kansas City, Missouri, appearing for the Appellee.

Julie Gantz, Attorney (Eric S. Dreiband, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, and Vincent J. Blackwood, Assistant General Counsel, with her on the brief), Equal Employment Opportunity Commission, Office of General Counsel, Washington, D.C., appearing for amicus curiae Equal Employment Opportunity Commission.

Before **TACHA**, Chief Circuit Judge, **BALDOCK**, and **LUCERO**, Circuit Judges.

**TACHA**, Chief Circuit Judge.

Plaintiff-Appellant Jennifer J. Mickelson sued her employer, Defendant-Appellee New York Life Insurance Company ("NYL"), alleging retaliation and discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and salary discrimination under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d). The District Court granted summary judgment in favor of NYL on all claims. On appeal, Ms. Mickelson argues that there is a genuine issue of material fact regarding whether she was paid less than male employees performing the same work because of her sex and whether the actions of her employer constitute an adverse employment action. We take jurisdiction under 28 U.S.C. § 1291 and REVERSE.

## I. BACKGROUND

NYL sells life insurance products to independent insurance brokers throughout the United States. Sales are made mainly through field directors—marketing representatives who promote the sale of NYL products and services to the independent insurance brokers. Field directors receive internal support from marketing service consultants ("MSC"). An MSC acts as a liaison between the field directors, who are out in the field selling insurance, and NYL's

producing groups.  Six MSCs worked in NYL's Leawood, Kansas office.

That office hired Ms. Mickelson as an MSC in September 2000.  Ms. Mickelson's resume indicates that she graduated from law school in May 2000 and that for the six years before and during law school she worked part-time for another life insurance company, first in the underwriting department, and later (for the last six months), as a marketing service representative—a position very similar to the one she was hired to perform at NYL.  Because of her law degree, Ms. Mickelson was assigned to the MSC group responsible for high net worth clients and corporations; for this reason, the group was considered relatively prestigious.  Although a law degree was not required for her position, NYL believed it added to Ms. Mickelson's credibility when dealing with those clients; additionally, Ms. Mickelson used her legal knowledge to prepare estate planning illustrations for those clients.  Although she did not have any insurance-related professional licences when she was hired, she steadily worked toward and obtained a Series 6 license.[1]  In addition, Ms. Mickelson earned a "Fellow Life Management Insurance" designation, which indicates extensive knowledge of products in the life insurance industry, as well as a "Chartered Life Underwriter" designation, which indicates passage of ten professional courses.

When a new employee is hired, NYL assigns him or her to a grade level;

---

[1]A Series 6 license is required in order to sell mutual funds and variable annuities.

each grade level carries a specific salary range. Typically, MSCs are assigned to grade level 13, which carries a salary range of $45,100 to $69,900. John Begley, the director of human resources at the Leawood office, and James Vavra, the vice-president of operations at the Leawood office, assigned Ms. Mickelson to grade level 13 and set her salary, without negotiation, at $50,000. By September 2002 she was earning $53,400.

Vickie Day was hired as an MSC in October 2000, the month after Ms. Mickelson. Ms. Day brought to NYL five years of experience working in the life insurance industry, as well as eleven years experience in an administrative assistant position. She had a Bachelor's degree and Series 6 and 63[2] professional licenses. Her salary immediately prior to being hired at NYL was $48,000. Like Ms. Mickelson, Ms. Day was assigned to grade level 13 and her starting salary was $50,000. By September 2002, Ms. Day's salary was $52,500.

Mark Shelton was hired as an MSC in December 2000, three months after Ms. Mickelson. Mr. Shelton had a Bachelor's degree and twenty years of experience in the insurance industry. His salary immediately prior to being hired at NYL was $43,000. He was assigned to grade level 14, which carries a salary range of $51,100 to $79,200, and his salary was set at $60,000. By September 2002, his salary was $61,300.

Kevin Harriman was hired as an MSC in February 2002. Mr. Harriman had

---

[2]A Series 63 license is required to be a securities agent.

two years of experience as a marketing and business analyst at a life insurance company. It appears that Mr. Harriman's experience in the life insurance industry is limited to these two years. He also had three years of experience working as a securities trader and financial analyst, and two years of experience as a mutual fund representative in which he acted as a liaison between the fund and the broker/dealer. Mr. Harriman had a Bachelor's degree and was working toward obtaining his Masters in Business Administration when he was hired. He also had Series 6, 7,[3] and 63 professional licenses. In his most recent job prior to being hired at NYL, he earned $55,000, although for the six months prior to being hired at NYL he was unemployed. He was assigned to grade level 13 and Mr. Begley, Mr. Vavra, and Tracie Billings, the MSC supervisor, set his starting salary at $60,000. No documents were prepared describing how Mr. Harriman's salary was set.

Two other MSCs worked in the Leawood office—James Wirtz and Susan Hairgrove. Both were hired in 1993. Although the record does not reveal their qualifications, starting salaries, or performance histories, in 2000, Ms. Hairgrove earned $51,732, compared to Mr. Wirtz's $55,737 salary. By September 2002, both were considered senior MSCs but Ms. Hairgrove earned $63,915 while Mr. Wirtz earned $72,265—a difference of over $8,000.

---

[3]A Series 7 license is required in order to trade in corporate securities, other than commodities and futures.

Shortly after Mr. Harriman was hired, Ms. Mickelson learned that his starting salary was set at $60,000. She made a written inquiry to Ms. Billings asking what criteria were involved in setting salaries. Ms. Billings and Mr. Vavra met with Ms. Mickelson to discuss her concerns. Mr. Vavra told Ms. Mickelson that four factors were taken into consideration in setting Mr. Harriman's salary—experience, qualifications, market factors, and salary history. Not satisfied that these reasons could explain the disparity in pay, Ms. Mickelson made a formal complaint of salary discrimination to NYL's home office in New York City. She sent a copy of the complaint to Mr. Begley. NYL conducted an internal investigation of the complaint and concluded that the disparity in pay was warranted based upon Mr. Harriman's relevant experience in the broker-dealer market, NYL's current need for expertise in that market, Mr. Harriman's and Ms. Mickelson's relative salary histories, and their respective professional licenses. In March 2002, Ms. Mickelson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

According to Ms. Mickelson, after she filed her complaint, she experienced several adverse employment actions. First, although Mr. Vavra had personally committed to look for opportunities for Ms. Mickelson in NYL's legal department, he never reported back to her about whether there were any such openings. Second, Ms. Billings cancelled a business trip to Boston that Ms. Mickelson was scheduled to take. Third, Ms. Billings told Ms. Mickelson that

she would need to use her vacation time to study for a bar examination she was taking the following week, although Ms. Mickelson was previously told that she did not have to use her vacation time.[4]  Fourth, Mr. Vavra sent Ms. Mickelson an e-mail, which she considered demeaning, informing her that one of her projects was "DEAD."  Fifth, she met with Mr. Vavra, Ms. Billings, and another employee named Louis Gardner to discuss the fact that Ms. Mickelson was asking Mr. Gardner questions regarding work when he was not her supervisor.  Mr. Vavra became extremely angry during the meeting.  Sixth, after she became engaged to the field director to whom she provided support services, Ms. Mickelson asked that she be promoted to a "key accounts" position or moved to another distribution source because she felt that it was not in the "company's best interest to have a married couple working on the same marketing team."  Ms. Billings initially suggested that the "key accounts" position would be a good move for Ms. Mickelson; but later, Ms. Billings indicated that there were no openings for that position.  She was then reassigned to a different field director in a less-prestigious MSC group.

Finally, in December 2002, Ms. Mickelson took medical leave pursuant to

[4]Ms. Mickelson had previously taken two bar exams and both times she received paid time off to study.  After Ms. Billings said she would need to use her vacation time to study for the third bar exam, Ms. Mickelson had her previous supervisor confirm that she previously received paid time off.  Accordingly, when Ms. Mickelson sat for her third exam, she received the same time off that she did the previous two times.

the Family and Medical Leave Act ("FMLA") and was treated for depression and panic attacks. Her leave was scheduled for December 9, 2002, through January 13, 2003. After she had been on leave for approximately two weeks, however, she inquired as to whether she could return to work on a part-time basis because her doctor indicated it would be "a good step" for her. Ms. Billings denied her request, stating that because of business demands and staffing requirements, her position had to be filled by a full-time employee. This response came despite the fact that NYL's employee handbook indicates that FMLA leave for a serious health condition "can be taken intermittently or on a reduced schedule if medically necessary," and despite the fact that Ms. Hairgrove, another MSC, suffered a back injury at work in December 2002 and was permitted to return to work part-time from March through May 2003. After Ms. Mickelson's request to work part-time was denied, Ms. Mickelson's condition worsened. She had to extend her leave until February 19, 2003, which was when her FMLA leave was exhausted. When she could still not return to work, she was fired.

Ms. Mickelson filed this complaint against NYL in May 2003, alleging salary discrimination on the basis of sex in violation of both Title VII, *see* 42 U.S.C. § 2000e-2, and the Equal Pay Act, *see* 29 U.S.C. § 206(d)(1). She also alleged that NYL retaliated against her for filing her salary discrimination complaint, also in violation of Title VII, *see* 42 U.S.C. § 2000e-3. The District Court granted summary judgment in favor of NYL on all claims. In dismissing

the salary discrimination claims, the court held that NYL showed that the reason for the disparity in pay between Ms. Mickelson and the male employees was based upon their relative experience and qualifications. As to her retaliation claim, the court held that Ms. Mickelson had not shown an adverse employment action. Ms. Mickelson now timely appeals the District Court's order granting summary judgment.

## II. DISCUSSION

### A. Standard of Review

We review the District Court's entry of summary judgment de novo. *Plotke v. White*, 405 F.3d 1092, 1093 (10th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Plotke*, 405 F.3d at 1093–94.

### B. Salary Discrimination

There are two ways a plaintiff can proceed on a claim of salary discrimination: on a theory of intentional discrimination on the basis of sex in violation of Title VII, or on a theory of wage discrimination on the basis of sex in violation of the EPA. This is a significant distinction because a plaintiff's burden

to prove discrimination varies depending on the statute at issue. Under Title VII, the plaintiff always bears the burden of proving that the employer intentionally paid her less than a similarly-situated male employee. The EPA, however, has been described as imposing a form of strict liability on employers who pay males more than females for performing the same work—in other words, the plaintiff in an EPA case need not prove that the employer acted with discriminatory intent. *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000); *Sinclair v. Auto. Club of Okla., Inc.*, 733 F.2d 726, 729 (10th Cir. 1984); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) (stating that the EPA "prescribes a form of strict liability").

Because of this difference in the statutes, the analysis involved in determining whether the plaintiff has met her burden differs depending on the statute at issue. Under Title VII, a plaintiff must prove that the employer intentionally discriminated against her because of her sex. *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1306 (10th Cir. 2005). When the plaintiff relies on circumstantial evidence of discrimination—as is the case here—we apply the three-step burden-shifting framework set forth in *McDonnell Douglas* and its progeny. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973); *Plotke*, 405 F.3d at 1100. Under *McDonnell Douglas*, the aggrieved employee must first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Relevant to this case, a prima facie showing of discrimination

consists of evidence that a female employee "occupies a job similar to that of higher paid males." *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1114 (10th Cir. 2005) (quotation omitted). If the plaintiff makes such a showing, the burden of production shifts to the employer "to state a legitimate, nondiscriminatory reason for its adverse employment action." *Plotke*, 405 F.3d at 1099 (quotation omitted). "If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id.*

Claims based upon the EPA, however, do not follow the same *McDonnell Douglas* burden-shifting framework. Rather, EPA claims proceed in two steps. First, the plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work. *Miller*, 420 F. 3d at 1119.[5] Having met this, the burden of *persuasion* then shifts to the defendant to prove that the wage disparity was justified by one of four permissible reasons. *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir.1993). "These reasons are: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality

---

[5]Specifically, a prima facie case of discrimination under the EPA consists of proof that (1) the plaintiff was performing work which was substantially equal to that of employees of the opposite sex, taking into consideration the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) employees of the opposite sex were paid more under such circumstances. *Miller*, 420 F.3d at 1119.

of output; (4) a disparity based on any factor other than sex." *Id.* (citing 29 U.S.C. § 206(d)(1)). If the employer "fails to convince the jury with its evidence of one or more of the 'affirmative defenses' . . . the plaintiff will prevail on her prima facie case." *Id.* This is not to say that an employer may never be entitled to summary judgment on an EPA claim if the plaintiff establishes a prima facie case. But, because the employer's burden in an EPA claim is one of ultimate persuasion, "in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3rd Cir. 2000) (quotation omitted).

The employer's burden in an EPA case differs from its burden in a Title VII case for another reason. Whereas in a Title VII case the employer need only proffer a legitimate, nondiscriminatory reason for the challenged action, with no need to establish that the reason *actually* motivated the decision, the EPA prohibits a disparity in pay between men and women "except where such payment *is made pursuant to*" one of the four aforementioned affirmative defenses. 29 U.S.C. § 206(d)(1) (emphasis added). The Third Circuit has explained, and we agree, that this language requires an employer to "submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." *Stanziale*, 200 F.3d at 107–108. Accordingly,

"where, as here, employers seek summary judgment as to [an] Equal Pay Act claim, they must produce sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." *Id.* at 108; *see also Tenkku v. Normandy Bank*, 348 F.3d 737, 741 n.2 (8th Cir. 2003) ("At the summary judgment stage of the proceedings, the employer's justification for the differences is irrelevant, unless it is strong enough to establish one of the statutory affirmative defenses as a matter of law.").

Because of the varying burdens of proof, it is conceivable that in some cases an employer would be entitled to summary judgment on the Title VII claim, but not on the EPA claim. We leave that discussion for another time, however, because in this case we hold the following with respect to NYL's proffered reasons for paying the male employees more than Ms. Mickelson: (1) that Ms. Mickelson has presented sufficient evidence of pretext to survive summary judgment on her Title VII claim; and (2) that NYL has failed to establish that its proffered reasons were in fact the reason for the disparity in pay as a matter of law on the EPA claim. We first turn our attention to the EPA claim.

Significantly, NYL admitted for purposes of summary judgment, that Ms. Mickelson made a prima facie showing of discrimination under the EPA. Therefore, summary judgment for NYL is inappropriate unless "no rational jury could conclude but that the proffered reasons actually motivated the wage

disparity of which the plaintiff complains." *Stanziale*, 200 F.3d at 108. Before the District Court, and at oral argument, NYL focused on Mr. Harriman's relevant experience in the broker-dealer market—which refers to the market for variable life insurance products—as warranting the disparity in pay because, at the time he was hired, NYL was trying to break into the broker-dealer market to sell variable life insurance products and needed Mr. Harriman's expertise to do so. Indeed, an employee's prior experience is a factor "other than sex" for purposes of the Equal Pay Act. *Angove v. Williams-Sonoma, Inc.*, 70 Fed. App'x 500, 508 (10th Cir. 2003) (citing *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995)), *see also Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005). Although this reason *could* explain the wage disparity, we cannot conclude, as a matter of law, that it *in fact* explained the wage disparity.

To begin, no documents were executed contemporaneously with Mr. Harriman's hiring that indicated NYL was looking for someone with broker-dealer experience or that Mr. Harriman was hired because of his broker-dealer experience. When Ms. Mickelson first inquired as to why Mr. Harriman's starting salary was twenty percent higher than her own, Mr. Vavra made no mention of NYL's need for someone with experience in the broker-dealer market. He merely said that Mr. Harriman's "experience, qualifications, market factors, and salary history" warranted the disparity in pay. The form prepared after Mr. Harriman's interview states that the reason he was hired was because of his "life ins[urance]

-14-

background, self-motivation/drive, team orientation, relevant non-life [insurance] experience (i.e. marketing, communications, securities[)]." Although Mr. Harriman's experience and qualifications necessarily include his broker-dealer experience, the first indication that NYL was looking for such experience and that Mr. Harriman's background in that field warranted the disparity in pay came from the New York office's internal investigation of Ms. Mickelson's complaint. It is undisputed, however, that the New York office played no role in setting either Ms. Mickelson's salary or Mr. Harriman's salary. The results of its internal investigation, therefore, cannot be conclusive on this issue.

Moreover, though NYL maintains that it was trying to penetrate the broker-dealer market at the time it hired Mr. Harriman, Mr. Vavra admitted that the market for those products crashed in the summer of 2001, well before Mr. Harriman was hired, and that NYL sold very few variable life insurance products as a result. Also, what is conspicuously missing from the record is any suggestion that Mr. Harriman ever used his experience in the broker-dealer market in any capacity at NYL. In fact, Mr. Vavra admitted that Mr. Harriman's responsibilities were essentially the same as Ms. Mickelson's.

In addition, it is undisputed that Ms. Mickelson and Ms. Day had more life insurance industry experience than Mr. Harriman—Mr. Harriman's resume reflects that he had only two years of experience in the life insurance industry. In contrast, Ms. Mickelson had approximately six part-time years in the life

insurance industry before she was hired at NYL, and another eighteen months of experience in the industry by the time Mr. Harriman was hired. Similarly, Ms. Day had five years of experience in the life insurance industry when she was hired, and another seventeen months' experience by the time Mr. Harriman was hired. Of course, Mr. Shelton had the most experience of all—eighteen years—and if he were the only higher-paid MSC at NYL's Leawood office, we might well conclude that his experience so far outweighed the women's experience that no rational trier of fact could conclude other than that his experience was the determinative factor in setting his salary. But that is not the case: Mr. Harriman, with the least amount of experience in the life insurance industry of all the MSCs, was paid substantially more than both Ms. Mickelson and Ms. Day. Moreover, as of September 2002, he was earning $3,900 less than Ms. Hairgrove, a senior MSC who had been working at NYL for approximately nine years.

There are also disputed issues of fact as to whether "market factors" and "salary history" warranted the disparity in pay. As to "market factors" playing a role in setting Mr. Harriman's salary, Ms. Billings recalled that Mr. Harriman had multiple job offers and that NYL had to compete for his services. *See Stanley v. Univ. of Southern Cal.*, 13 F.3d 1313, 1322 (9th Cir. 1994) ("An employer may consider the marketplace value of the skills of a particular individual when determining his or her salary."). But NYL produced no evidence that it had to

-16-

pay him $60,000 in order to retain him. Further, it is undisputed that Mr. Harriman was unemployed for six months prior to being hired at NYL, and Ms. Mickelson said that during the interview process, which she took part in, that Mr. Harriman said he was "desperately" trying to find a job. As for Mr. Harriman's prior salary history as justification for the wage disparity, this reason is undermined by the fact that at her previous job Ms. Day was making $48,000 and her salary was set at $50,000, while Mr. Shelton was making $43,500 at his previous job and his salary was set at $60,000.[6]

Casting further doubt on NYL's asserted justifications for the disparity in pay is that one of its reasons was that Mr. Harriman has more NASD licenses, which refers to the Series 6, 7, and 63 licenses. To begin, NYL presented no evidence that a Series 7 license is either required or even relevant to the MSC job. Further, Ms. Mickelson had a Series 6 license and a CLU designation—which neither Mr. Shelton nor Mr. Harriman had. Mr. Vavra testified that the CLU designation was more important to the position than a Series 7 license. Indeed, NYL's advertisement for the MSC position states that it prefers an applicant with a CLU designation. Finally, Ms. Day had both a Series 6 and 63 when she was hired, and her starting salary was twenty percent less than Mr. Harriman's.

---

[6]We note that Mr. Shelton received an unspecified bonus as part of his prior employment, which means that his total compensation could have been significantly higher than $43,000. Because we must consider the facts in the light most favorable to Ms. Mickelson, however, we cannot make such an assumption.

Based on the foregoing, and based on the fact that the employer bears the burden of persuasion, we conclude that the District Court erred in granting summary judgment in favor of NYL on the EPA claim. When the evidence is viewed in the light most favorable to Ms. Mickelson, a jury would not be compelled to find that the reasons proffered by NYL were, in fact, the reason for the disparity in pay. To be sure, these reasons could explain the disparity, but the evidence here is not so overwhelming as to require that conclusion. To the contrary, a jury could reasonably conclude that the common denominator between the $60,000 salaries was being male, not the level of experience, and the common denominator between the $50,000 salaries was being female, not the level of inexperience.

Turning to Ms. Mickelson's Title VII claim, we first must address an evidentiary matter. Ms. Mickelson argues that the District Court improperly excluded evidence that other females had complained of discriminatory treatment by NYL. Specifically, the District Court disregarded the affidavits of Julie Hammer-Miller, a former service associate at NYL, and Rhonda Kunz, a former human resources administrative assistant at NYL. Ms. Hammer-Miller averred that she helped to train Ms. Mickelson and Mr. Shelton as MSCs and that both needed an equal amount of training. Ms. Hammer-Miller also claimed that she herself sought a promotion to the MSC position because she was already performing the same duties as an MSC, but for less money. When she asked Mr.

Begley for the promotion he repeatedly told her that it was "in the works" but she never was promoted. She ultimately resigned in March 2001; at that time her salary was $35,000.

Ms. Kunz, whose position involved reviewing personnel records, keeping track of attendance and vacation schedules, and ensuring that pay raises earned by employees were actually received, averred that she believed there was "no concern for equal pay for equal work" at NYL's Leawood office. Indeed, when she and two others earned their bachelor's degrees at the same time, only the male of the group received a $5,900 raise, while the women did not.

The District Court disregarded these affidavits, finding that they "contain[ed] conclusory allegations that are not supported by the record." *See Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990). As a general rule, however, "the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent." *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990); *see also Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1149 (10th Cir. 1999). Both these women testified from personal knowledge. Ms. Hammer-Miller said that she trained both Ms. Mickelson and Mr. Shelton for the MSC position and that they needed the same amount of training. When the employer's proffered reason for the twenty percent difference in their salaries is, in part, based upon experience and qualifications, that both employees needed the same amount of training is relevant

-19-

to determination of discriminatory intent. Similarly, Ms. Kunz's testimony that a similarly situated male received a raise while she and another woman did not is relevant to the issue of discriminatory intent. The District Court erred in disregarding these affidavits. *See Spulak*, 894 F.2d at 1156 (citing *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir.1985) (reversing summary judgment for employer, holding that affidavits of former employees created a genuine issue of fact on issue of defendant's discriminatory intent)).

We turn now to the *McDonnell Douglas* framework. As with Ms. Mickelson's EPA claim, the parties agree that Ms. Mickelson has met her burden to establish a prima facie case of discrimination—that is, she occupies a job similar to that of higher paid males—and that NYL met its burden to proffer a legitimate, nondiscriminatory reason for the disparity in pay—namely, the relative experience, qualifications, market factors, and salary histories of the higher paid male employees. The remaining question, therefore, is whether Ms. Mickelson has produced sufficient evidence that NYL's proffered reasons are pretext for unlawful discrimination to survive summary judgment. "A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Green v. New Mexico*, 420 F.3d 1189, 1192–93 (10th Cir. 2005) (internal quotations omitted). _____

-20-

As the above discussion demonstrates, Ms. Mickelson has cast doubt on all NYL's proffered reasons for paying Mr. Harriman a substantially larger salary for performing identical work such that a jury might reasonably disbelieve NYL's proffered reasons for the disparity in pay, and conclude, instead, that NYL discriminated on the basis of sex in setting salaries. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (holding that "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). We therefore conclude that the District Court erred in granting summary judgment in favor of NYL on the Title VII claim.

C.   Retaliation

To state a prima facie case of retaliation, a plaintiff is required to demonstrate: "(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006)) (footnote omitted). Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* The burden then shifts back to the plaintiff to show that the employer's proffered

reason is pretext. *Id.* at 1203. The District Court concluded that Ms. Mickelson failed to make a prima facie showing of retaliation because she failed to show that she suffered from any adverse employment action.

After reviewing the record, we conclude that the District Court erred in granting NYL's motion for summary judgment with respect to NYL's refusal to allow Ms. Mickelson to work part-time while she recovered from depression, and as to her ultimate termination. The FMLA requires covered employers to allow qualified employees twelve weeks' leave, within a twelve-month period, because of a serious health condition. 29 U.S.C. § 2612(a)(1)(D). Leave "may be taken intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1). Failure to adhere to the mandates of the FMLA, without sufficient justification, can constitute actionable conduct under Title VII. *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1151 (10th Cir. 2005). The District Court appears to have concluded that the refusal to allow an individual to work on a part-time basis could only be actionable if the employee raises and establishes a violation of the FMLA. Since Ms. Mickelson did not raise an FMLA claim, the court found that she failed to establish that she suffered from an adverse employment action. We disagree.

Prior to the expiration of her FMLA leave, Ms. Mickelson requested to return to work on a part-time basis, indicating that her physician thought it would be "a good step" for her. NYL, however, refused her request, her condition

worsened, and by early January 2003, Ms. Mickelson had exhausted her paid leave. Therefore, NYL's denial of Ms. Mickelson's request to work part-time before she exhausted her FMLA leave prevented her from earning income on a part-time basis. It also caused her to exhaust her FMLA leave sooner. In this way, NYL's conduct caused her to lose both salary and benefits. *See White*, 126 S. Ct. at 2408 ("[M]any reasonable employees would find a month without a paycheck to be a serious hardship."); *Duncan v. Manager, Dept. of Safety*, 397 F.3d 1300, 1314 (10th Cir. 2005) (adverse employment action includes those decisions "causing a significant change in benefits"). Moreover, if Ms. Mickelson was permitted to return on a part-time basis, she may have recovered from her depression before her FMLA leave expired, and consequently, would not have lost her job. Indeed, "[i]t hardly requires stating that when an employer tells an employee that she no longer has a job, that employee's job status has been significantly and materially altered." *Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1216 (10th Cir. 2006). We easily conclude that the prospect of losing wages, benefits, and ultimately a job would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *White*, 126 S. Ct. at 2415.

Ms. Mickelson has also raised a genuine issue of fact as to whether the denial of her request for leave was causally connected to her protected conduct. Ms. Mickelson filed a complaint with the EEOC in March 2002. She was denied permission to work part-time in December of that year. While the timing between

these events, alone, would not support an inference of causation in this instance, *see Wells*, 325 F.3d at 1217, "[i]f the employee can show that the employer's proffered reason for taking adverse action is false, the factfinder could infer that the employer was lying to conceal its retaliatory motive," *id.* at 1218.[7] NYL's proffered reason for denying Ms. Mickelson's request was that the MSC position must be filled by a regular, full-time employee. But this contention is belied by the fact that just three months later, NYL permitted Ms. Hairgrove to transition back to work on a part-time basis following a back injury. NYL contends that the situation is different because Ms. Hairgrove suffered from a worker's compensation injury, while Ms. Mickelson did not. NYL fails to explain—and we do not see—how this distinction is relevant to the disputed matter. NYL's accommodation of Ms. Hairgrove provides evidence that the MSC position could be filled by a part-time employee, and therefore bolsters Ms. Mickelson's position

---

[7]As we explained in *Wells*:

> [B]y considering an employer's proffered reasons for taking adverse action in the causal-connection portion of the prima facie case, we are assessing pretext evidence that is typically considered in a later phase of the *McDonnell Douglas* analysis. But . . . evidence of pretext can be useful in multiple stages of a Title VII retaliation claim . . . "and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other. . . . [W]e will not limit the kinds of evidence that can be probative of a causal link any more than the courts have limited the type of evidence that can be used to demonstrate pretext."

325 F.3d at 1218 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000)).

-24-

that NYL's justification of its denial of her request is pretextual. NYL also contends that Ms. Mickelson requested to work on a part-time basis permanently, and seeks to distinguish its refusal of her request to work part-time on this basis. Again, the record reveals the opposite. Ms. Mickelson specifically requested to work part-time as a first step toward resuming her normal duties.

That Ms. Mickelson did not raise a claim under the FMLA does not change this analysis. Even if NYL was under no legal obligation to allow Ms. Mickelson to work part time or allow her to return to work after her FMLA leave expired, its failure to do so, in light of her request, and in light of the fact that it permitted another MSC to do so, could be viewed as retaliation. *See Wells*, 325 F.3d at 1219 (stating that an employer's termination of an employee after exhaustion of sick leave could be considered retaliatory). The causal-connection inquiry does not focus on what the FMLA or personnel rules required the employer to do, but whether the employer treated an employee differently than it would have if she had not engaged in protected activity. *Id.* In sum, Ms. Mickelson's evidence that she was denied the ability to work part-time and was terminated in retaliation for her wage discrimination complaint is sufficient to satisfy the causal-connection element of the prima facie case.[8]

_____

[8]The District Court correctly dismissed Ms. Mickelson's claim relating to her reassignment to a different MSC group. Reassignment of job duties is not automatically actionable. *White*, 126 S. Ct. at 2417. Ms. Mickelson suggests, however, that the new group was less prestigious than her previous group, which

(continued...)

We next turn to the second and third steps of the *McDonnell Douglas* burden-shifting framework for a retaliation claim—namely, whether the employer had proffered a legitimate, nondiscriminatory reason for the adverse action and whether the employee has produced sufficient evidence of pretext. As the causal-connection discussion above shows, Ms. Mickelson produced sufficient evidence that NYL's proffered reasons for the adverse action was pretextual. *See id.* (acknowledging that in some cases, evidence of causation and evidence of pretext may be the same and the tests for causation and pretext may be conflated). Because Ms. Mickelson has demonstrated that genuine issues of fact remain as to Ms. Mickelson's claim that NYL retaliated against her by denying her the ability to work part-time and in terminating her, we conclude that summary judgment was inappropriate.

With regard to Ms. Mickelson's other allegations of retaliation, we agree with the District Court that she has failed to establish actionable conduct. As to her claim that Mr. Vavra failed to locate a position in the legal department for her and that NYL failed to promote her to a key accounts position, a plaintiff must apply for a position to state a claim for retaliatory failure to promote, *see Stover*

[8](...continued)
is a factor that is appropriately considered in determining whether the conduct is actionable. *See id.* Nevertheless, because it is undisputed that Ms. Mickelson sought a transfer once she became engaged to her previous group's supervisor, Ms. Mickelson has failed to establish a causal connection between this action and her protected conduct.

-26-

*v. Martinez*, 382 F.3d 1064, 1072 (10th Cir. 2004), and there is no evidence that either position existed at the time she sought the promotions. As to her claim relating to the time she was absent due to the bar examination, there is no evidence that she was actually treated differently when studying for her third bar examination as compared to when she studied for her first two. With regard to the email Ms. Mickelson considered derogatory and Mr. Vavra's unruly behavior during a meeting, the retaliation provision prohibits employer's actions "that are likely to deter victims of discrimination from complaining to the EEOC," and a "lack of good manners will not create such deterrence." *White*, 126 S. Ct. 2415 (citing 2 EEOC 1998 Manual § 8, p. 8–13) (internal quotation marks omitted).

### III. CONCLUSION

For the foregoing reasons, we conclude that the District Court erred in entering summary judgment in favor of NYL on Ms. Mickelson's allegations of wage discrimination and retaliation. Accordingly, the judgment of the District Court is REVERSED and the cause REMANDED for further proceedings consistent with this opinion.