2021 UT App 99

# THE UTAH COURT OF APPEALS

MISTY VONDELL HITESMAN,
Appellant,
*v.*
UNIVERSITY OF UTAH,
Appellee.

Opinion
No. 20190884-CA
Filed September 23, 2021

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 170900636

Mary J. Woodhead, Attorney for Appellant

Sean D. Reyes and J. Clifford Petersen, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and DIANA HAGEN concurred.

POHLMAN, Judge:

¶1     For nearly nine years, Misty Vondell Hitesman worked as
a sponsored project officer at the University of Utah in its Office
of Sponsored Projects (the OSP). After resigning in 2017, she
brought a claim against the University for violations of the Equal
Pay Act of 1963, a federal statute that protects against wage
discrimination based on sex.

¶2     The University moved for summary judgment, arguing
that it paid Hitesman less than her male colleagues due to factors
other than gender. The district court was persuaded and granted
the University's motion. Hitesman now appeals, contending that
there are material questions of fact that preclude summary
judgment on her claim. We agree and reverse.

## BACKGROUND[1]

### *The OSP*

¶3 The University hired Hitesman in January 2008 to work in the OSP as a sponsored project officer. In that role, Hitesman primarily analyzed and facilitated the assignment, allocation, and budgeting of grants and contracts brought to the University by faculty. She also ensured that grants complied with federal law and University policies.

¶4 Hitesman was just one of many sponsored project officers in the OSP, including W.E. and J.P.—both men. W.E. was hired by the University more than a decade before Hitesman; J.P. was hired one and a half years after Hitesman. All three employees were paid different salaries and all were supervised by B.B., Director of the OSP (Director). Director assigned work to the sponsored project officers and he was aware of, and had input on, the salaries they received.

### *The Salaries*

¶5 In 2008, Hitesman's starting salary was $53,325. When she resigned nine years later, her salary had increased by approximately $6,000—to $59,648.

¶6 According to Director, the OSP bases salary on "an individual's duties, competency, experience, performance, and market forces and not on gender. It considers an employee's duties, seniority, performance, work load, experience, market rates, and education . . . ." Director would, at times, advocate for salary adjustments for sponsored project officers in the OSP,

---

1. When reviewing a grant of summary judgment, we view "the facts in a light most favorable to the losing party below." *Goodnow v. Sullivan*, 2002 UT 21, ¶ 7, 44 P.3d 704 (cleaned up).

although not always at the same rates. In 2013, Director advocated for a salary increase for Hitesman and other OSP employees so as to compensate them "commensurate with their experience levels." Director did the same in 2014, explaining that the "minimal increases" Hitesman in particular had received since she joined the OSP "ha[d] certainly not kept pace with the skills and experience that [she] ha[d] gained over the last 6 years."

¶7    Although Hitesman was consistently paid less than W.E.—who was making $75,940 at the time of Hitesman's resignation—her salary was "generally on par" with J.P.'s until "approximately the first part of 2013." By the time Hitesman resigned in 2017, J.P.'s salary had increased to $68,340—nearly $9,000 more than Hitesman's.

*The Pay Disparity Explanations*

¶8    Director testified that W.E.'s twenty-year "career and experience at age 66 justify a salary differential in relation to Hitesman's approximately 9 years with the OSP." Director also compared the number of "transactions" W.E. completed against the number Hitesman completed between July 1, 2013, and June 30, 2015. W.E. completed 831 transactions compared to Hitesman's 269.

¶9    In comparing J.P. to Hitesman, Director testified that J.P.'s higher salary was "supported by [his] very good performance and high quantity of work in relation to his peers," including Hitesman. Between July 1, 2013, and June 30, 2015, J.P. completed 390 transactions compared to Hitesman's 269.

¶10    Director also attributed Hitesman's lower pay raise in 2016 in comparison to her male colleagues to her "low productivity, and her failure to build positive working relationships in performing her work." In addition, Director referenced a complaint he received in 2013 from a faculty

member "about Hitesman's performance, professionalism, and attitude." However, one of Hitesman's other supervisors told her that the faculty member was a "habitual complainer," and the complaint never led to a written notice or any other discipline. (Cleaned up.)

¶11    In fact, during Hitesman's tenure at the OSP, she never received any written evaluation or other written notice that her performance "was other than acceptable." Hitesman received her last formal evaluation in 2013 and was told she "[met] expectations." She "never received another formal evaluation and never received any written evaluation or other written notice that [her] performance was other than acceptable." Instead, she "often received positive feedback from departments with whom [she] worked."

¶12    With regard to productivity, Hitesman had no ability to influence the number of transactions her assigned departments received. Some transactions could be "very simple and take very little time to negotiate and finalize," while others "involved substantial work and were more difficult depending on the other party and the research or other work involved." Further, during Hitesman's time at the OSP, "discussions of productivity, performance and customer service were not tied to numbers of transactions" and "[p]roductivity statistics were never part of salary or performance reviews." Director "never indicated that he considered numbers of transactions when determining the salaries of other employees," nor did he keep Hitesman up to date on her transaction rates.

*The Litigation*

¶13    After resigning in 2017, Hitesman sued the University under the Equal Pay Act, alleging that the University paid her less than several male employees, including W.E. and J.P., for performing the same work.

¶14 Following discovery, the University filed a motion for summary judgment in which it argued that Hitesman had not established a prima facie case under the Act because "the work she performed was not substantially equal to that of the male employees she name[d] as comparators." In the alternative, the University invoked affirmative defenses under the Act and claimed that Hitesman's lower pay was based on factors other than her gender. Specifically, it argued that W.E. and J.P. were paid more than Hitesman because of their higher transaction numbers. It further justified Hitesman's lower salary by pointing out that Director had "received complaints about Hitesman's unprofessional work performance" but had not received comparable complaints about J.P. Lastly, regarding W.E., the University argued that his higher salary was, at least in part, due to his years of experience.

¶15 The district court first determined that Hitesman "was unable to meet her prima facie burden as it related to" five of the employees she named in her complaint.[2] Next, it rejected the University's argument that Hitesman could not make out a prima facie case for an Equal Pay Act claim regarding W.E. and J.P. But the court agreed with the University that Hitesman's difference in pay was based on either a "system that measures earnings by quantity [or quality]" or "factors other than sex." (Cleaned up.) The court thus granted the University's motion and dismissed Hitesman's claim. Hitesman appeals.

---

2. Hitesman does not challenge the district court's determination that she failed to establish a prima facie case for those five employees. Thus, we do not address the merits of Hitesman's claim relative to those five employees, and the court's ruling on that point remains intact.

ISSUE AND STANDARD OF REVIEW

¶16    Hitesman contends that the district court improperly granted summary judgment in the University's favor on her claim for violations of the Equal Pay Act. In reviewing a district court's grant of summary judgment, we review its legal conclusions and its ultimate grant of summary judgment for correctness. *Cochegrus v. Herriman City*, 2020 UT 14, ¶ 14, 462 P.3d 357.

ANALYSIS

¶17    The district court rejected the University's argument that, on summary judgment, Hitesman could not make out a prima facie case for Equal Pay Act violations with regard to two of her coworkers: W.E. and J.P. Still, it granted summary judgment to the University on Hitesman's claim, concluding that the University established one of two statutory affirmative defenses to the pay disparity between Hitesman and her male colleagues. Citing W.E.'s twenty years of experience and the men's greater transaction numbers, the court concluded that the University demonstrated, as a matter of law, that the pay disparity was attributable to "a system which measures earnings by quantity or quality of production" or a "factor other than sex." 29 U.S.C. § 206(d)(1)(iii), (iv).

¶18    Hitesman appeals, challenging the district court's determination that the University proved any one affirmative defense as a matter of law. Specifically, she contends that questions of material fact regarding why W.E. and J.P. were paid more preclude summary judgment in the University's favor. In contrast, the University defends the court's decision, arguing that it firmly established an affirmative defense to Hitesman's claim. Alternatively, the University invites this court to affirm on the ground that Hitesman cannot make a prima facie case.

¶19 "Summary judgment is only appropriate 'if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Arnold v. Grigsby*, 2018 UT 14, ¶ 8, 417 P.3d 606 (quoting Utah R. Civ. P. 56(a)). Accordingly, "[t]he district court must deny a motion for summary judgment if it finds that there is a genuine issue of material fact that bears on its legal determination or if it finds, as a matter of law based on the undisputed facts, that the moving party is not entitled to a legal ruling in its favor." *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 9, 215 P.3d 152. To determine whether a genuine factual dispute exists, we ask "whether reasonable jurors, properly instructed, would be able to come to only one conclusion, or if they might come to different conclusions, thereby making summary judgment inappropriate." *Cochegrus v. Herriman City*, 2020 UT 14, ¶ 14, 462 P.3d 357 (cleaned up).

¶20 We begin our analysis by discussing the contours of and the parties' relative burdens under the Equal Pay Act—a federal statute that has received little attention from Utah courts.[3] We then address the issue of Hitesman's prima facie case and the University's contention that she has failed to demonstrate that she received unequal pay for substantially equal work. Finally, we address Hitesman's challenge to the district court's

---

3. As best we can tell, the only Utah appellate case addressing the Equal Pay Act is *Kopp v. Salt Lake City*, 506 P.2d 809 (Utah 1973), in which the Utah Supreme Court concluded that "the test as to discrimination in rate of pay cannot properly be based solely upon whether the plaintiff was doing the same work, and/or with the same degree of competence as other employees, but can also be determined on the basis of classification, seniority and other factors," including experience and training. *Id.* at 811 & n.2.

determination that the University has established at least one statutory affirmative defense as a matter of law.

A.     The Equal Pay Act

¶21     Congress enacted the Equal Pay Act in 1963 to remedy "a serious and endemic problem of employment discrimination in private industry" by mandating equal pay for equal work regardless of an employee's sex. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (noting congressional concerns that "the wage structure of many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same" (cleaned up)). The Act requires employers to pay employees the same wages it pays to "the opposite sex" for equal work that requires "equal skill, effort, and responsibility, and which [is] performed under similar working conditions." 29 U.S.C. § 206(d)(1).

¶22     To bring a wage discrimination claim under the Equal Pay Act, a plaintiff need prove only that (1) the employee was performing work that was "substantially equal" to that of an employee of the opposite sex "considering the skills, duties, supervision, effort and responsibilities of the jobs"; (2) "the conditions where the work was performed were basically the same"; and (3) the employee of the opposite sex was "paid more under such circumstances." *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir. 1993); *see also Corning*, 417 U.S. at 195. The Equal Pay Act imposes a form of strict liability on employers; once a plaintiff demonstrates wage disparity within the scope of the Act, the plaintiff "need not prove that the employer acted with discriminatory intent." *EEOC v. Maryland Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018); *see also Mickelson v. New York Life Ins.*, 460 F.3d 1304, 1310–11 (10th Cir. 2006).

¶23     Once a plaintiff makes a prima facie case, the burden of proof shifts to the employer to show that the wage disparity was

justified by at least one of four permissible bases, *Corning*, 417 U.S. at 196–97: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex," 29 U.S.C. § 206(d)(1). An employer's burden of proving one or more of these exceptions "is one of ultimate persuasion." *Mickelson*, 460 F.3d at 1311. In other words, an employer must "submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." *Id.* at 1312 (cleaned up). "At the summary judgment stage, this means an employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." *Riser v. QEP Energy*, 776 F.3d 1191, 1198 (10th Cir. 2015) (cleaned up).

B.    Hitesman's Prima Facie Case

¶24    Before addressing its alleged justification for the pay disparity between Hitesman and her male colleagues, the University invites us to affirm the district court's decision on an alternative ground. The University contends that it was entitled to summary judgment because Hitesman cannot prove that she performed work "substantially equal to that of" W.E. and J.P., and thus she cannot establish a prima facie case. Specifically, the University contends that Hitesman's work was not substantially equal to W.E. and J.P. because the men "had significantly higher transaction completion numbers than Hitesman." (Cleaned up.) On this record, we are not persuaded.

¶25    Work is "substantially equal" for purposes of the Equal Pay Act if it "requires equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). This inquiry "turns on the actual content of the job," *Riser*, 776 F.3d at 1196, "not the ability of the employees holding those positions," *Cooke v. United States*, 85 Fed. Cl. 325, 342 (2008). That is, work is considered substantially equal so long as employees have the same duties or perform the same

tasks, even if one employee performs those tasks with "[d]isproportionate frequency." *Brennan v. Prince William Hosp. Corp.*, 503 F.2d 282, 287 (4th Cir. 1974); *see also Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989) (explaining that under the Equal Pay Act, a plaintiff need show only that the relevant jobs "have a common core of tasks" (cleaned up)); *Savignac v. Jones Day*, No. 19-2443 (RDM), 2021 WL 1700193, at *1, *9 (D.D.C. Apr. 28, 2021) (rejecting the argument that a plaintiff must establish as part of her prima facie case under the Equal Pay Act that "she in fact performed equally to her comparators").

¶26 Here, Hitesman, W.E., and J.P. all shared the same duties and performed the same tasks. They held the same job title; they worked in the same department; and they each were required to analyze and facilitate the assignment, allocation, and budgeting of grants and contracts brought to the University by faculty. Although W.E. and J.P. completed transactions at a greater frequency than Hitesman during the 2013–2015 time period, the University has not shown that W.E. and J.P. were *required* to complete more transactions than Hitesman. Instead, the evidence produced on summary judgment established that the positions held by Hitesman, W.E., and J.P. required equal skill, effort, and responsibility, even if W.E. and J.P. ultimately completed more transactions.

¶27 The University's position fails for the additional reason that it is built on an, as yet, unproved premise. The University argues that "the completion numbers speak for themselves" and "show substantially *different* skills, duties, efforts, and responsibilities." (Cleaned up.) But the evidence in the summary judgment record undermines the University's claim that a higher transaction rate necessarily equals greater skills and duties. Hitesman averred that some transactions are "very simple" and require little effort, while others are more difficult and "involve[] substantial work." Thus, it is not enough for the University to simply point to higher transaction completion numbers as proof that W.E.'s and J.P.'s positions required greater skill. The

completed transactions would need to be comparable for the differential to be meaningful. This unanswered qualitative differentiation leaves a material factual question in dispute.

¶28    In sum, the evidence presented on summary judgment demonstrated that the positions held by Hitesman, W.E., and J.P. required equal skill, effort, and responsibility. Thus, we conclude that the district court did not err in deciding that Hitesman had established a prima facie case under the Equal Pay Act, and we decline to affirm the court's decision on this alternative ground.

C.    The University's Affirmative Defenses

¶29    After rejecting the University's contention that Hitesman could not establish a prima facie case for Equal Pay Act violations based on a comparison to W.E. and J.P., the district court concluded that the University was yet entitled to summary judgment based on its assertion of two statutory affirmative defenses. Specifically, the court concluded that the University had shown, as a matter of law, either that the pay disparity was due to "a system that measures earnings by quantity [or quality] of production" or that it was due to "factors other than sex." (Cleaned up.) Hitesman attacks both of these justifications. In assessing Hitesman's arguments, we are mindful that for the University to prevail at the summary judgment stage, it "must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." *Mickelson v. New York Life Ins.*, 460 F.3d 1304, 1311 (10th Cir. 2006) (cleaned up).

1.    A system which measures earnings by production quantity or quality

¶30    The district court determined, as a matter of law, that the University proved that Hitesman's pay disparity was based, at least in part, on the third affirmative defense under the Equal Pay Act—"a system which measures earnings by quantity or quality of production." 29 U.S.C. § 206(d)(1)(iii). Hitesman

argues that the court erred in its decision because the University did not demonstrate the existence of such a system.[4]

¶31    A system which measures earnings by quantity or quality of production is one of three "system" defenses available to employers under the Equal Pay Act. *See id.* § 206(d)(1)(i)–(iii). The Act does not define the word "system," but the Supreme Court has held that the word should be interpreted the same way under the Equal Pay Act as it is under Title VII of the Civil Rights Act. *County of Washington v. Gunther*, 452 U.S. 161, 170 (1981).

¶32    The first type of system—a seniority system—has been addressed in depth by the Supreme Court. *See generally California Brewers Ass'n v. Bryant*, 444 U.S. 598 (1980). To successfully apply the affirmative defense of a seniority system, an employer must show that the system is "bona fide." *Id.* at 610–11 (cleaned up). In other words, the system must have "ancillary rules that accomplish certain necessary functions . . . [and] rules that delineate how and when the seniority time clock begins ticking, as well as rules that specify how and when a particular person's seniority may be forfeited." *Id.* at 607. Similar guidelines have been applied to the use of the second defense—a merit system. *See, e.g.*, *Hodgson v. Brookhaven Gen. Hosp.*, 436 F.2d 719, 726 (5th Cir. 1970) ("The employer must show that its 'merit system' is administered, if not formally, at least systematically and objectively."); *Flory v. Salt Lake County Sheriff's Office*, 680 F.

---

4. Hitesman also argues that the district court erred when it granted summary judgment to the University based on the first affirmative defense under the Equal Pay Act—the existence of a seniority system. But the University did not argue, and the court did not conclude, that the pay disparity in the OSP was due to a seniority system. Because the court did not rely on this affirmative defense to grant summary judgment to the University, it cannot be a basis for error.

Supp. 1504, 1506 (D. Utah 1988) (explaining that a valid merit system "must be an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria" (cleaned up)).

¶33 Likely because the third defense—a system which measures earnings by quantity or quality of production—is so similar to a merit system, there is very little case law discussing it. *See* 1 Susan M. Omilian & Jean P. Kamp, *Sex-Based Employment Discrimination* § 8:4 (June 2021 Update). But it makes sense that the same type of organization and structure required of a seniority and merit system would be required of a system measuring production quantity or quality. And this view is supported by other jurisdictions that have addressed the third system as an affirmative defense. For example, in *Diamond v. T. Rowe Price Associates, Inc.*, 852 F. Supp. 372 (D. Md. 1994), the court stated that the third type of system must rely on "performance-based or other objectively verifiable criteria." *Id.* at 391. Similarly, the court in *EEOC v. Shelby County Government*, 707 F. Supp. 969 (W.D. Tenn. 1988), determined that the employer failed to establish the third type of system because, other than "a fleeting reference," it provided "no evidence supporting the existence of such a system." *Id.* at 984.

¶34 Applying these principles here, the University need not prove the existence of a formal, written system that measures earnings by production quantity or quality to defeat Hitesman's Equal Pay Act claim. But for an employer to successfully rely on such a system as an affirmative defense, there must be some sort of objective standards to measure its employees' production quantity or quality. And those standards should be applied uniformly. Subjective criteria applied at random, especially when known only to the employer, do not qualify as a system which measures earnings by production quantity or quality. The University has not met its burden.

¶35 For one thing, the University points to no set of rules or a structured procedure whereby salaries were set according to productivity criteria. There is no explanation of how transactions were valued or how closed transactions translated into wage increases. Instead, Director claims that W.E.'s and J.P.'s higher productivity justified their higher wages, but Director does not describe a system whereby those wages were set. Further, even if productivity was considered when setting salaries in the OSP, there is no evidence that objectively verifiable criteria were applied. In fact, while Hitesman worked at the OSP, productivity statistics were not part of performance reviews, and Director never indicated to Hitesman that he considered transaction rates when determining employee salaries.

¶36 Based on this record, we cannot conclude that the evidence is so overwhelming that no rational jury could reject the University's claim that the pay disparity between Hitesman and her male colleagues was based on a system which measures earnings by quantity or quality of production. *See Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015). Thus, the district court erred to the extent that it relied on the third affirmative defense to grant summary judgment in favor of the University.

2. Any other factor other than sex: the catch-all

¶37 Hitesman next challenges the district court's determination that the University established the fourth affirmative defense under the Equal Pay Act as a matter of law. This fourth exception, known as the "catch-all exception," *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 204 (1974), allows for a pay "differential based on any other factor other than sex," 29 U.S.C. § 206(d)(1)(iv).

¶38 This broadly worded exception has been interpreted by the United States Court of Appeals for the Seventh Circuit as "embrac[ing] an almost limitless number of factors, so long as they do not involve sex." *Fallon v. Illinois*, 882 F.2d 1206, 1211

(7th Cir. 1989). But the majority of the federal circuit courts have concluded that although the "any other factor other than sex" exception is broad, it must still be business related. *Rizo v. Yovino*, 950 F.3d 1217, 1223–24 (9th Cir. 2020) (en banc) (joining the Second, Fourth, Sixth, Tenth, and Eleventh Circuits in concluding that the fourth affirmative defense to the Equal Pay Act is limited in scope and "comprises only job-related factors"). In other words, any factor that does not relate to sex and does not fit into one of the first three exceptions, falls into this last exception so long as it "is rooted in legitimate business-related differences in work responsibilities and qualifications for the particular positions at issue." *See Riser*, 776 F.3d at 1198 (cleaned up).

¶39    The University contends that Hitesman was paid a lower wage than W.E. and J.P. for business-related reasons other than sex. Specifically, the University argues that Hitesman's lower wage was justified because the OSP had received complaints about her performance, she completed fewer transactions than her colleagues, and, with regard to W.E., she had less time on the job. But to meet its burden of persuasion, it is not enough for the University to produce evidence that *could* explain the wage disparity; instead, the evidence must be so clear that no rational jury could conclude otherwise. *Id.* We agree with Hitesman that although "these reasons could explain the disparity, . . . the evidence here is not so overwhelming as to require that conclusion." *See Mickelson v. New York Life Ins.*, 460 F.3d 1304, 1314 (10th Cir. 2006).

¶40    Despite Director's statement that he had received complaints about Hitesman, she was never disciplined. Rather, she was led to believe that the complaint the University relies on to make its case was not taken seriously by the OSP because it had been made by a "habitual complainer." (Cleaned up.) Indeed, the only performance evaluation Hitesman received during her nine years at the OSP indicated that she met expectations.

¶41 Further, Director's attempts to explain the pay disparity between Hitesman and W.E. and J.P. were equivocal and conflict with other evidence. For example, while Director claims that W.E.'s and J.P.'s higher salaries are justified by higher productivity, Director does not attest that productivity actually played a role in setting their salaries.[5] In other words, productivity *could* explain the wage disparity, but the University, at least at this stage of the proceedings, has not shown that productivity was the reason the salaries were set as they were. The University's claim also conflicts with Hitesman's testimony that transaction rates were not a factor in setting salaries at the OSP. Such conflicts in the evidence must be resolved by the factfinder at trial, not as a matter of law on summary judgment.

¶42 Similarly, Director's claim that W.E.'s higher salary was justified by more years on the job does not establish that the University set W.E.'s salary based on that seniority. After all, Hitesman was senior to J.P. but was paid less. Thus, the affirmative defense has not been proved so clearly that "no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which [Hitesman] complains." *See id.* at 1312 (cleaned up).

---

5. Without addressing W.E. and J.P. directly, Director did aver that Hitesman's "normal cost of living increase" in 2016 was reduced by .5% due to complaints about Hitesman and her "low productivity" and that "this measure was intended to reinforce the message that Hitesman was not meeting the expectations of her job." Yet Hitesman disputes Director's claim, attesting that he "never told [her] that [her] raise had been limited in 2016 to half a percentage due to alleged poor performance." Moreover, Director's averment does not account for the entirety of the pay disparity between Hitesman and her male colleagues.

¶43   The University, of course, may ultimately be able to prove that the pay disparity of which Hitesman complains is based on factors other than sex. But the University's assertions that productivity and seniority justify the pay differential are, without more, insufficient to prove that the University, in fact, based the pay of the OSP staff on these factors and that no jury could conclude otherwise. At the very least, the evidence is not so overwhelming as to compel the conclusion as a matter of law at the summary judgment stage. Thus, we reverse the district court's grant of summary judgment in favor of the University.[6]

CONCLUSION

¶44   We conclude that the district court did not err in determining that Hitesman established a prima facie case under the Equal Pay Act. We also conclude that the University did not prove, as a matter of law, that Hitesman's pay disparity was due to a system which measures earnings by production quantity or quality or due to a factor other than sex. Because there is a genuine dispute as to material facts in this case, we reverse the district court's order granting summary judgment in favor of the University and remand for further proceedings.

───────────

6. Hitesman also argues that justifications based on seniority and productivity cannot be considered under the fourth affirmative catch-all defense because they are factors that apply, if at all, under one of the first three defenses. In other words, Hitesman argues that if the University cannot prove a seniority or productivity defense, it cannot rely on those factors in asserting the catch-all defense. Because we resolve this appeal on other grounds, we do not reach this argument.